[Civ. No. 12667.  Second Dist., Div. One.  Dec. 16, 1941.]

TRACY C. HICKS, Respondent, v. HUGH SCOTT et al., Appellants.

J. Marion Wright, Robert Brennan, M. W. Reed, Leo E. Sievert and H. K. Lockwood for Appellants.

Joseph L. Fainer, Albert Anix and Thomas Connell for Respondent.

SHAW, J. *pro tem.*—The defendants, Hugh Scott and The Pullman Company, appeal from a judgment in favor of plaintiff Tracy C. Hicks, in a suit for personal injuries. In his complaint said plaintiff alleges that he was a passenger for hire on a car of defendant, The Pullman Company, and that after he had retired to his berth for the night the defendant Scott attacked him and with force and violence pulled him from his berth so as to cause him to strike his back on a portion of the car, thus inflicting on him the injuries complained of, and that prior to this assault the plaintiff summoned the Pullman porter for help but the porter did not come, and the defendant Pullman Company gave him no aid during the assault. The defendants denied substantially all of the allegations of the complaint. After a trial by the court sitting without a jury, findings and judgment were made in favor of plaintiff.

Plaintiff was a member of a fraternal organization which had arranged a trip for its members from Los Angeles to Sacramento and San Francisco, and had chartered for that purpose a special train including a number of Pullman sleeping cars. The plaintiff procured tickets entitling him to a berth on this train, and entered the train to make the trip. He went to bed about midnight and went to sleep. By reason of some error into which we do not deem it necessary to inquire, the plaintiff got into the wrong berth, retiring in upper berth 12 of car No. 208. The defendant Scott, who had lower berth 12 in the same car, came to the berth about three hours later, found the proper occupant of upper 12 ensconced in lower 12, because of the presence of plaintiff in upper 12, and the defendant then waked up the plaintiff. Thereupon an altercation ensued, in regard to which there is much conflict in the testimony. According to the testimony of the plaintiff, which was disputed by several witnesses and corroborated by none, Scott finally grabbed him by the left arm and around the shoulders, and forcibly

pulled him from the berth down to the floor, in spite of plaintiff's effort to resist, saying at the same time, "God damn your soul, get out of there or I will jerk you out." As plaintiff fell, he struck his back on the arms of the berth opposite, thus receiving injuries for which he sues.

The defendant Scott contends that he cannot be held liable jointly with The Pullman Company for the reason, if we understand his argument, that the liability asserted against him is for a willful act of assault and battery, whereas the liability of The Pullman Company rests on negligence in not properly watching the car and going to plaintiff's rescue. But each liability is based upon an alleged breach of duty to plaintiff imposed by law, a tort, and the situation as alleged is such that without either breach of duty the injury to plaintiff would not have happened at all. The case is within the principle declared in *Shea* v. *City of San Bernardino* (1936), 7 Cal. (2d) 688, 694 [62 Pac. (2d) 365]. The case is not like those cited by defendant Scott wherein independent torts cause separate and independent injuries, in which cases of course there is no joint liability for the aggregate of all the injuries. Each of the causes of action above mentioned was alleged in the complaint and defendant Scott's objection here is really one of misjoinder, but no demurrer was filed by him and he is therefore not in a position to raise the point even if it were good.

Defendants contend that the finding as to the extent of plaintiff's injuries lacks evidentiary support. The finding on this subject is that plaintiff "was caused to and did sustain and suffer a compression fracture of the bodies of the first and second lumbar vertebrae of the spine; fracture of transverse process of second vertebrae, causing permanent injury," with a further statement of pain, confinement and inconvenience caused thereby. It is conceded that there is evidence of a fracture of the transverse process, but defendants strongly insist that there is no evidence at all of the compression fracture of the bodies of the first and second lumbar vertebrae, and we are unable to find any such evidence. The nearest approach to it is in the testimony of a physician who examined plaintiff and took X-rays of his back about twenty months after the injuries were received. He saw in those X-rays evidence of fractures of the two vertebrae last mentioned, and in a written report then made

expressed the opinion that those fractures had been caused by plaintiff's fall, but when he came to testify as a witness in this action he stated that he had, since his examination of plaintiff, seen other X-rays of plaintiff's back taken within a few hours after the fall, in which the same fractures of the first and second lumbar vertebrae appeared as old fractures and that, by reason of this appearance, ''I will have to change my opinion on that.'' This testimony does not support the finding of which complaint is made. According to the testimony of the experts, a fracture of the body of a vertebra is much more serious than a fracture of the transverse process. The award of damages based upon an unsupported finding that there was a fracture of the bodies of two vertebrae cannot be allowed to stand.

The defendant, The Pullman Company, complains that it was not permitted to show that all persons on the train were comporting themselves in a peaceable and orderly manner, and that it therefore had no reason to expect or guard against such violence as that of which plaintiff complains. In behalf of that defendant questions were propounded to several witnesses who were on the special train during the trip from Los Angeles to Sacramento and who had ample opportunity to observe what was going on, including a passenger agent of the railroad company, its head brakeman, its conductor, the Pullman conductor and the Pullman porter of the car in which the trouble between plaintiff and defendant Scott occurred. All of these witnesses, except the porter, made frequent trips through the train while it was en route and were asked questions relating to conditions on the train in general. The Pullman porter was asked particularly about conditions on the car above mentioned. Objections to these questions on the ground that they were incompetent, irrelevant and immaterial, were uniformly sustained.

A sleeping car company operating sleeping cars in connection with railway trains is not regarded as a common carrier, except where a statute so declares. (13 C. J. S. 1739, 1740.) It is, however, required, even if not a common carrier, to exercise a high degree of care for the personal safety and comfort of its passengers. (13 C. J. S. 1744.) There is conflict among the authorities on the question whether such a company, though not technically a com-

mon carrier, should observe the same degree of care towards its passengers as a common carrier. We think the better reason is with the decisions which do require that degree of care. (*Caldwell* v. *Pullman Co.* (1925), 132 S. C. 321 [128 S. E. 504]; *Mixon* v. *Southern Ry. Co.* (1927), 139 S. C. 343 [138 S. E. 45, 49]; *Bonner* v. *Pullman Co.* (1931), 160 S. C. 531 [159 S. E. 382, 76 A. L. R. 922, 925]; *Forbes* v. *Pullman Co.* (1926), 137 S. C. 433 [135 S. E. 563, 566]; *Nevin* v. *Pullman Palace Car Co.* (1883), 106 Ill. 222, 230 [46 Am. Rep. 688]; *Pullman Co.* v. *Hoyle* (1908), 52 Tex. Civ. App. 534 [115 S. W. 315, 319].)

▇ Applying the common carrier rules, one of them is that "the liability of a carrier to a passenger for the acts of strangers or fellow-passengers is relative, qualified and contingent upon whether the carrier, or its agents, has, or from known conditions should have, knowledge of conditions from which mischief is to be reasonably apprehended, and has neglected to prevent the injury." (*Schwerin* v. *H. C. Capwell Co.* (1934), 140 Cal. App. 1, 3 [34 Pac. (2d) 1050]. See, also, 13 C. J. S. 1747; note in 15 A. L. R. 871, where many cases are cited to the proposition that "a carrier will not be held liable for an assault on a passenger by a fellow passenger, committed under such circumstances that it could not reasonably have been anticipated by the employees of the carrier in time to prevent it"; and supplemental notes citing further cases to the same rule, in 42 A. L. R. 169 and 43 A. L. R. 1035.)

▇ The trial court, doubtless having this rule in mind, made a finding that, "for some time immediately prior to the time of the assault made upon said plaintiff by said defendant Hugh Scott, hereinbefore referred to, a number of other passengers occupying the same coach as that occupied by the plaintiff, had been indulging in intoxicating liquor and were acting in a generally noisy and boisterous manner, all of which was known to and observed by said defendant The Pullman Company, its agents, servants and employees." We find in the record no evidentiary support for this finding, except a general statement by the Pullman conductor that, "They were a pretty drunken bunch." This statement was not directed to any particular persons or car, but apparently referred to the passengers on the train in general, and we doubt its sufficiency to support the finding. But, in

view of this finding, which is now relied on to support the judgment, the evidence which defendants attempted to produce regarding the conduct of the passengers at the time, should have been received.

A special rule has been declared applicable to sleeping car companies at night. In *Carpenter* v. *New York etc. R. Co.* (1891), 124 N. Y. 53 [26 N. E. 277, 21 Am. St. Rep. 644, 11 L. R. A. 759, 762], the court stated this rule as follows: "A corporation engaged in running sleeping-coaches, with sections separated from the aisle only by curtains, is bound to have an employee charged with the duty of carefully and continually watching the interior of the car while berths are occupied by sleepers." This rule has been approved in many other cases including *Calder* v. *Southern Ry.* (1911), 89 S. C. 287 [71 S. E. 841, 845, Ann. Cas. 1913A, 894]; *Caldwell* v. *Pullman Co.* (1925), 132 S. C. 321 [128 S. E. 504, 505]; *Pullman Co.* v. *Culbreth* (1924), 2 Fed. (2d) 540 [42 A. L. R. 164, 167]. In *Carpenter* v. *New York etc. R. Co., supra,* the court stated the reasons for this rule as follows: "These cars are used by both sexes, of all ages, by the experienced and inexperienced, by the honest and dishonest, which is understood by the carriers. . . . A traveler who pays for a berth is invited and has the right to sleep, and both parties to the contract know that he is to become powerless to defend his property from thieves, or his person from insult, and the company is bound to use a degree of care commensurate with the danger to which passengers are exposed." Similar reasons are mentioned in the other cases just cited.

The rule just referred to is not one created by statute but one worked out by the courts from the necessities of the situation and it presents a proper case for the application of the maxim that "When the reason of a rule ceases, so should the rule itself." (Civil Code, section 3510.) The reasons given for the rule, as stated in the cases, are in substance that while a passenger is asleep he cannot watch out for threatened danger, defend himself or call for help, and that the passengers in sleeping cars may include both those especially vulnerable to attack or theft and also those disposed to commit such acts. The latter reason would ordinarily be absent in a case such as we have here, where a whole train has been chartered by a fraternal organization of men, and

the passengers are all members of that organization. No reason would appear, in such a case, for expecting the passengers to assault each other or commit other unlawful acts toward each other; and without such reason the sleeping car company should not be held to the anticipation of such acts. Hence we think that the rule above stated should not be held applicable as a matter of law to the operator of sleeping cars engaged in such an expedition. In such case the question would be one of fact, whether the circumstances as they developed and were made known to the agents of the sleeping car company required precautions against such acts. On this issue the evidence of good conduct that The Pullman Company attempted but was not permitted to produce here would be material and its exclusion was error.

The judgment is reversed.

York, P. J., and White, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied February 11, 1942. Curtis, J., Houser, J., and Carter, J., voted for a hearing.