[L. A. No. 19864. In Bank. Mar. 25, 1947.]

RAY W. FIELDS, Respondent, v. FRED SANDERS et al.,
Appellants.

Sidney A. Moss for Appellants.

Shibley, Wanzer & Litwin and Charles E. Litwin for Respondent.

SPENCE, J.—In this action for damages for assault and battery, jury verdicts were returned in favor of plaintiff as follows: (1) Compensatory damages in the sum of $3,000 against various members of the Krieger family doing business as Krieger Oil Company and its employee, Fred Sanders; and (2) exemplary damages in the sum of $350 against Fred Sanders alone. The members of the Krieger Oil Company have appealed from the $3,000 judgment entered upon the first verdict and Sanders has appealed from the $350 judgment entered upon the second verdict against him.

The sole point presented by the briefs is whether Sanders, admittedly the employee of the Krieger Oil Company, was acting within the scope of his employment at the time of the commission of the assault hereinafter related. The trial court decided the question as a matter of law in instructing the jury that Sanders' conduct was to be deemed that of his employer. While ordinarily such question is one of fact for the determination of the jury, the record in this case sustains the propriety of the trial court's view that the point at issue was one for its decision.

The assault was committed in the course of an altercation between plaintiff, Ray W. Fields, and the employee, Fred Sanders, immediately following an alleged collision between their respective vehicles on the highway in the early morning of September 19, 1944. Plaintiff's complaint contained two causes of action, the first relating to property damage and the second relating to general damages for malicious assault and battery. However, the court granted a nonsuit as to the first cause of action because of plaintiff's failure to offer proof in support thereof, and only the second cause of action proceeded to judgment. With the argument on this appeal directed entirely to the court's disposition of the issue of the scope of employment in relation to the doctrine of *respondeat*

*superior,* only the evidence relevant to that contested point need be reviewed here.

At about 1:50 a. m. of the date mentioned Sanders drove a truck, with a tank trailer attached, belonging to the Krieger Oil Company, from the refinery yard at Clearwater. He had been instructed to proceed to Camp Kearney near San Diego with a load of oil, and he started on this mission by driving in a southerly direction on Lakewood Boulevard. This boulevard connects with Highway 101 near the easterly boundary of the city of Long Beach, where a traffic circle is located. At the same time that Sanders was proceeding south on Lakewood Boulevard, plaintiff, accompanied by his wife, was driving his Dodge automobile in the same direction.

According to plaintiff's testimony, the following events occurred on the road: Just as his car entered the traffic circle, a truck started to pass him. When he was on the west side, next to the curb, he noticed that the truck was crowding him and finally struck his car and knocked it over the curb. Momentarily he stopped, then got back on the road and continued until he overtook the truck, honked his car's horn, and asked the driver, Sanders, to stop. Sanders did so, pulling over to the side of the road, and Fields parked his car a few feet in the rear of the truck. Thereupon Fields left his car, went to the right side of the truck and addressed Sanders in the following language: "My God, what are you trying to do, kill a man? You ran me off the road, run me over the curb and struck my car. . . ." Sanders denied that he had done so and Fields then said: ". . . let us go back and see what damage is done." Sanders rejoined: "I didn't strike your car." Fields replied: ". . . we will talk that matter over but first let me get your number and your company and your driver's license, so if I want to file a complaint I can . . . all I want is your number, the name of your company and your license. . . ." Thinking Sanders was going to drive away, Fields turned to the left to get Sanders' number and "Just then the door flew open and he jumped out with a flashlight and struck at me, and missed me, and when he did that, I told him if he wanted to play like that all right, if he wanted to fight, lay the flashlight down and fight like a man anyway." Fields stated that Sanders then jumped back into the truck, slammed the door and raced his motor. "I thought he was leaving, and I started back to the back to get his number again, and just then the door flew open and he

jumped out with this large instrument and he struck me just as I turned, and hit me on the top of the head, and I sure went down on my knees—I went down part way. As I raised up he struck me again in the back of the head, knocking me to my knees, and I don't remember any more—I mean, I was knocked unconscious.''

Plaintiff's wife corroborated, in the main, her husband's account of the events and of the injuries which he received and stated that he recovered consciousness on the way to the hospital. She stated that after her husband parked the car and walked over to Sanders' truck, she ''got out to see what damage had been done''; that she saw the men ''were arguing about something there''; and that she was ''about 18 or 20 feet'' from her husband ''at the time he was being struck by'' Sanders. She said that a light in the traffic circle enabled her to see Sanders as he hit her husband and she described the ''large instrument'' that he used as a wrench approximately two and one-half feet long.

In the phases of his testimony which are material to this discussion, defendant Sanders did not differ in any essential particular from plaintiff and his wife in relating the sequence of events on the road. He stated, however, that he ''stopped three times in all'' in the course of his altercation with plaintiff: the first time was shortly after entering the traffic circle, when Fields drove his car ''up on the side on the right'' and ''hollered to'' Sanders ''what do you mean, trying to run a man over the curb, you think you are awful smart driving a big truck''; the second time was after Fields had ''pulled up . . . 60 or 70 feet into the middle of the circle and stopped and got out and came over and got on my running board on the right-hand side and he reached over to get ahold of me and drug me out of the truck, and cussed me . . .''; and the third time was after he told Fields that ''traffic [was] blocked'' so he pulled his truck and trailer a short distance out of the circle, when Fields ''stepped up on the running board again and . . . kept cussing. . . .'' With respect to this last encounter, Sanders stated that while Fields ''was standing there, he made a pass at me in the truck, so I just kicked the door open, right-hand door,—he was on the right, I just kicked the door open and he fell off on the ground. When he got up I was out. He made a swing at me and so I hit him, and he went down on his knees, and he got up

and made another swing at me and I hit him again, and he went down then. . . .'' Sanders added that Fields was not "unconscious" when he got in his truck and "pulled away to keep from having any trouble"; that Fields then "was standing up still wanting me to lay the wrench down and fight [but] I told him I couldn't fight." Sanders testified that Fields did not strike him at any time but he was frightened because he "was an old man" and Fields made "passes" at him. Sanders further stated that he at no time made a "pass" at Fields with a flashlight, saying he had none in his possession that night.

In this state of the record the court properly charged the jury as follows: "You are instructed that an employer, as principal, is liable for injuries to third persons resulting from the negligence, torts and wrongful and unlawful acts of their employees while acting within the general scope of their employment. In the case before us the conduct of Fred Sanders shall be deemed by you to have been the conduct of Krieger Oil Company of California."

Under the provisions of section 2338 of the Civil Code, a principal is liable for the "wrongful acts" of his agent committed "in and as a part of" the principal's business. Apt illustration of this concept of liability, premised upon the doctrine of *respondeat superior,* is the case of *Hiroshima* v. *Pacific Gas & Elec. Co.,* 18 Cal.App.2d 24 [63 P.2d 340], where it was held that the company's employee, whose duties were to collect power bills, was acting within the scope of his employment when he struck a customer in the course of an argument as to whether the customer had received a notice that his electric service would be discontinued if he did not pay his bill. In so deciding, the court said at page 28: "It is not necessary that the assault should have been made 'as a means, or for the purpose of performing the work he [the employee] was employed to do.' " Similarly, in *Stansell* v. *Safeway Stores, Inc.,* 44 Cal.App.2d 822 [113 P.2d 264], defendant's store manager was held to be acting within the scope of his employment when he quarreled with a customer over a grocery order and, following an exchange of opprobrious names, ran after and injured her. Likewise, in *Andrews* v. *Seidner,* 49 Cal.App.2d 427 [121 P.2d 863], where a cafe patron was struck by the bartender as the result of a quarrel precipitated by the latter's effort to collect for drinks that had been served, the cafe owner was held liable because "the assault was com-

mitted in and as part of business which the employee was authorized to transact for his employer." A succinct statement of the governing considerations in such situation under the settled authorities is found at page 430: "Responsibility of the principal results from acts so committed even though they be contrary to the principal's explicit instructions or otherwise unauthorized, or malicious or wilful. In considering whether an unauthorized wrongful act of an agent is attributable to his principal, we cannot look to the nature of such act alone to see whether it was committed in and as part of the transaction of the principal's business, but we must consider as well the activity of the agent on behalf of the principal in connection with which the act was committed. The inquiry is not whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal. Of course, where the agent, for however brief a space of time, has ceased to serve his principal, he alone is responsible for his acts during the period of such cessation. But the fact that the questioned act was unauthorized or, if wrongful, that it was not committed in order to further the interests of the principal, will not show such a departure from the service of the principal as will absolve the latter if the act was committed while the agent was still occupying himself with the principal's business within the scope of his employment. Support for these statements, with full citation and discussion of authorities will be found in *Johnson* v. *Monson*, (1920) 183 Cal. 149 [190 P. 635] ; *Ruppe* v. *City of Los Angeles*, (1921) 186 Cal. 400 [199 P. 496] ; *Hiroshima* v. *Pacific Gas & Elec. Co.*, (1936) 18 Cal.App.2d 24 [63 P.2d 340] ; *Stansell* v. *Safeway Stores, Inc.*, (1941) 44 Cal.App.2d 822 [113 P. 2d 264]."

In the light of these observations, the facts in this case determinative of the Krieger Oil Company's liability, under the doctrine of *respondeat superior*, for the assault committed by Sanders upon Fields stand undisputed. Admittedly, the employee Sanders was engaged in his employer's business while operating the truck along the highway to his appointed destination. In the course of such travel the collision with plaintiff's car allegedly occurred, with the result that the drivers of the respective vehicles were required by law to stop and each furnish the other with certain information and identification data. (Veh. Code, ch. 4, § 482(b).) Not only did the quarrel

leading to plaintiff's injury arise solely over Sanders' performance of his duties as the driver of the truck, but obviously Sanders' entire association with plaintiff arose out of his use of the public highway on his employer's business. Sanders' successive moving of the truck because it was obstructing traffic on the road was required under the law (Veh. Code, ch. 13, § 582), but the argument continued unabated and Sanders, in the final phase of the controversy, struck plaintiff with the wrench. The entire episode—embracing Sanders' "three stops" on the road and the assault on plaintiff—was an unbroken series of continuous and connected acts; and immediately thereafter Sanders got into his truck and proceeded down the highway on his oil delivery mission.

True, there are conflicts in the evidence as above recited but they have no significant bearing upon the single issue in question. Thus, the parties are in dispute as to these matters: (1) Whether in operating the truck, Sanders did actually collide with plaintiff's car in attempting to pass it on the highway; (2) whether in arguing and remonstrating with Sanders about his conduct, plaintiff precipitated the affray by making "passes" at Sanders and threatening to beat him— although Sanders admitted that plaintiff did not strike him at any time; (3) whether on the occasion of the second stop on the highway while the quarrel was continuing, Sanders struck at plaintiff with a flashlight; and (4) whether on the occasion of the third stop in the final phase of the altercation and following Sanders' successive hitting of plaintiff with the wrench, plaintiff was rendered "unconscious" by the blows or "was standing up still wanting [Sanders] to lay the wrench down and fight" as Sanders got in his truck and left the scene of action. Manifestly, these variances did not affect the sequence of events nor change the nature of the quarrel which arose, in, from, and as a part of Sanders' performance of his duties as a truck driver on the public highway. Any personal element entering in the verbal bout between plaintiff and Sanders, and assuming plaintiff's provocative conduct in "cussing" and making ineffective "passes" at Sanders, does not alter the fact that Sanders' entire course of action was inextricably intertwined with his service to his employer: his stopping of the truck as required by law after the alleged collision with plaintiff's car; his obligation to exchange identification data with plaintiff; his successive moves of the truck to avoid obstructing traffic on the highway; and

his continued denial of having struck plaintiff's car in attempting to protect his employer from liability in the matter. The culmination of the quarrel upon Sanders' perpetration of the assault and the infliction of injuries upon plaintiff indicates not a departure from the line and scope of his employment but rather an additional act committed "in and as a part of" his employer's business.

There is no force to the claim that Sanders' employment did not contemplate that he should enter into relations with third persons in the course of which he might become annoyed, lose his temper and commit an assault in "an altercation concerning the right of way or concerning some similar rule involving the reciprocal conduct of motorists on the highway." Sanders' truck-driving assignment obviously would bring him into contact with other drivers of vehicles lawfully using the public highways at the same time, would envisage his compliance with highway rules and regulations in the performance of his duties in the furtherance of his employer's business interests, and would embrace any conduct inseparably connected therewith. This point was considered recently by this court in the case of *Carr* v. *Wm. C. Crowell Co.*, 28 Cal.2d 652 [171 P.2d 5], where it was held that the undisputed facts established that the assault in question was the outgrowth of the employment. There in the course of a dispute over the laying of a hardwood floor, the employee of a building contractor threw a hammer at another workman, striking and injuring him. In commenting upon the "employer's responsibility for the tortious conduct of his employee" as a risk of the business, this court stated at pages 656: ". . . defendant's enterprise required an association of employees with third parties, attended by the risk that someone might be injured: 'The risk of such association and conditions were risks of the employment.' (Cardozo, J., in *Leonbruno* v. *Champlain Silk Mills*, 229 N.Y. 470, 472 [128 N.E. 711, 13 A.L.R. 522].) Such associations 'include the faults and derelictions of human beings as well as their virtues and obediences . . . They involve risks of injury and these risks are inherent in the working environment.' (Citing authorities.)"

It is further argued that while proceeding with the removal of the truck incident to his "three stops" on the highway, Sanders "had plenty of time to disengage himself from the quarrel and to allow his temper to cool," so that it could be inferred that only personal motives and reactions

motivated his continued battling with plaintiff. The record clearly negatives this line of argument. Apparently, Sanders at no time was acting in response to a loss of temper, for on cross-examination he testified that "at no time that evening" was he "angry at Mr. Fields"; that he "was very calm during the time all these things took place"; and that he "didn't get excited." And whether or not Sanders had opportunity to "disengage himself" from the quarrel is immaterial, for he didn't take advantage of it according to the undisputed facts showing that the altercation, engendered by Sanders' employment, continued unchanged in character throughout its rapidly succeeding stages and culminated in plaintiff's injury; and then only did Sanders "pull away" from the scene of action to proceed down the highway.

Nor is it of any consequence that "the employer here could not expect that the wrench would be used [by Sanders] as a club" to beat plaintiff. Neither could the employer in the recent case of *Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal. 2d 652, be deemed to have expected that a hammer, furnished as a working tool to his carpenter, would be hurled at another employee in the course of a dispute, striking and injuring him. Yet such circumstance of use of the instrument did not relieve the employer from responsibility for the wrongful act of his employee. As was there said at page 654: "It is sufficient . . . if the injury resulted from a dispute arising out of the employment." The same observation renders it immaterial that the jury impliedly found malice on ·the part of Sanders as the basis of its award of punitive damages against him alone. (*Deevy* v. *Tassi,* 21 Cal.2d 109, 125 [130 P.2d 389].)

"With respect to questions of fact the court reserves the power of deciding whether an issue should be presented to the jury: if reasonable men could not differ as to whether the evidence does or does not establish the existence of a fact, the court will not submit the issue to the jury." (*Mosley* v. *Arden Farms Co.,* 26 Cal.2d 213, 223 [157 P.2d 372, 158 A.L.R. 872] [concurring opinion].) In line with this settled principle courts have held as a matter of law that an employee at the time of the tortious conduct in question was not acting within the scope of his employment when the evidence clearly showed a complete abandonment thereof. (*Gordoy* v. *Flaherty,* 9 Cal. 2d 716 [72 P.2d 538]; *Peccolo* v. *City of Los Angeles,* 8 Cal. 2d 532 [66 P.2d 651]; *Kish* v. *California State Automobile Assn.,* 190 Cal. 246 [212 P. 27]; *Martinelli* v. *Stabnau,* 11 Cal.

App.2d 38 [52 P.2d 956]; *Humphry* v. *Safeway Stores, Inc.*, 4 Cal.App.2d 589 [41 P.2d 208]; *Gousse* v. *Lowe*, 41 Cal.App. 715 [183 P. 295].) Similarly, as indicated by the foregoing authorities, where the evidence clearly discloses, and is susceptible of but the single conclusion, that the employee's wrongful act was committed "in and as a part of" the employer's business, the court should so decide as a matter of law. We are of the opinion that the present case falls within this latter category, and that the issue of the scope of employment was therefore properly withdrawn from the jury in the course of the court's instructions.

Turning to the appeal of defendant Sanders from the judgment against him alone for exemplary damages in the sum of $350, no argument has been presented in support of that appeal and it must be deemed to be abandoned. No appeal was taken by defendant Sanders from the judgment entered jointly against him and the members of the Krieger Oil Company for compensatory damages in the sum of $3,000, and that judgment has long since become final as to him.

The judgments from which the appeals were taken are, and each of them is, affirmed.

Gibson, C. J., Shenk, J., Carter, J., and Traynor, J., concurred.

Edmonds, J., and Schauer, J., concurred in the judgment.