300 P.2d 170]

[Civ. No. 16712.   First Dist., Div. One.   Aug. 16, 1956.]

EDITH BERGER, Respondent, v. SOUTHERN PACIFIC COMPANY (a Corporation), Defendant; THE PULLMAN COMPANY (a Corporation) et al., Appellants.

Russel Shearer, Shearer, Thomas & Lanctot and Roderick L. Dewar for Appellants.

Leslie C. Gillen and Herbert Chamberlin for Respondent.

AGEE, J. pro tem.*—Defendants, The Pullman Company and J. V. Zeno, Jr., appeal from a judgment on a jury verdict in favor of plaintiff, Edith Berger, in an action for damages alleged to have been sustained by plaintiff while she was a passenger on a Pullman sleeping car. Defendant Southern Pacific Company was granted a nonsuit, and it is not involved in this appeal.

At Glendale, on October 7, 1951, about 8 p. m., Mrs. Berger boarded a Southern Pacific train with the intention of journeying to San Francisco. She was 48 years of age, frail, sick, and suffering from chronic tuberculosis. In addition, she was feverish and dehydrated as a result of diarrhea and was suffering from codeine withdrawal. She was assisted aboard the train by friends and a redcap porter to "Bedroom E" in a sleeping car known as "Clover Dell." This car was managed by Pullman and serviced by its porter, Zeno. The train was made up of 14 cars but the only sleeping car was the one mentioned and Zeno was the only Pullman employee aboard. Arrangements were made to wire ahead for a doctor

---

*Assigned by Chairman of Judicial Council.

if Mrs. Berger's condition should become worse during the trip. After the train was under way, Zeno entered the bedroom and made up the bed. While he was doing this, Mrs. Berger asked Zeno to place more blankets on her during the night if she became chilled, inasmuch as she was alternating between chills and fever. She also requested Zeno to bring her tea and toast. After making up the bed, Zeno departed. Mrs. Berger then took some nembutal, changed to night clothes, and got into bed. She soon went to sleep but awakened when Zeno returned with the tea. Zeno propped her up and held the teacup to her mouth in order that she might drink. From here on there are conflicts between the testimony of the parties and, accordingly, only Mrs. Berger's version will be recounted.

While Mrs. Berger drank the tea, she and Zeno conversed about her tuberculosis and her son's drug addiction. Zeno suggested that she take two more nembutal tablets. She did so. Zeno left but returned shortly and removed the tray. Mrs. Berger then fell asleep. The next thing she knew was that Zeno was over her person, engaging in an act of sexual intercourse with her. She was too weak to resist effectually and made no outcry because of fear. She testified: ''I don't believe he completed the act.'' No one at the time, other than the parties, was aware of the occurrence. Zeno wiped off his private parts and those of Mrs. Berger with a towel and left the bedroom. Mrs. Berger was exhausted and went back to sleep. She was awakened at Palo Alto by Zeno knocking on the door and telling her that the train was nearing San Francisco. Zeno carried Mrs. Berger in his arms from the train upon arrival at San Francisco and placed her in a wheel chair. She was met by her father-in-law. Two days later she told her physician of the alleged assault. This was the first person she had told. He could find no physical evidence of such assault.

Mrs. Berger's claim of being sexually assaulted, although completely uncorroborated and emphatically denied by Zeno, is not so incredible or inherently improbable as to justify an appellate court in substituting its opinion for that of the jury and the trial judge, who had an opportunity to express himself in ruling upon the motion for a new trial. However, the factual issue is so close, to say the least, that the claimed errors of law must be scrutinized carefully.

The action proceeded to trial on two counts. The first count

is based upon negligence, the second upon assault. Both counts allege that Zeno was the actor and was, at the time of the assault complained of, acting within the course and scope of his employment by Pullman. The first count alleged that Pullman negligently and carelessly omitted and neglected to provide safe passage for Mrs. Berger and, in particular, that Pullman (1) negligently and carelessly permitted and allowed Zeno to arrange the lock on the door of said bedroom so that said door could be opened from the outside or corridor of said car and (2) negligently and carelessly permitted and allowed Zeno to enter said bedroom and nurse plaintiff at various times through said night without sufficient or any supervision, and (3) negligently and carelessly permitted and allowed Zeno to and he did assault plaintiff.

There is no evidence of negligence whatsoever. Plaintiff herself testified that the friends who brought her to the train requested Zeno to look after her as she was sick; that she left the door unlocked so Zeno could serve her and look in from time to time to see if she needed more blankets or a doctor. There is no evidence that Zeno was carelessly selected as an employee or that he had any propensity toward molesting passengers. Nor is there any evidence that would justify a holding that Pullman was negligent in not having someone follow and observe Zeno each time he entered plaintiff's bedroom and, in particular, at the time he entered and committed the assault.

There were two forms of verdict given to the jury for its convenience, one being in favor of Pullman and Zeno and the other, which was adopted by the jury, reading as follows: "We the jury in the above-entitled cause find a verdict in favor of the plaintiff, Edith Berger, and against the defendants Pullman Company, a corporation, and J. V. Zeno, Jr., and we assess damages in the sum of (blank) Dollars." There is thus no way to ascertain whether the jury based its verdict on the first count or the second count or on both. █ However, the rule is that if the verdict in favor of a plaintiff is general in form and there is one count which is supported by the evidence and which is free from error, such verdict will be upheld. (2 Cal.Jur. p. 1029; 4 Cal.Jur.2d 509; 24 Cal. Jur. p. 885.)

█ Therefore, the erroneous submission to the jury of the first count (negligence) and the giving of instructions thereon is not prejudicial if the second count can be sustained.

█ As was said in *Leoni* v. *Delany*, 83 Cal.App.2d 303, 309

[188 P.2d 765, 189 P.2d 517] : "If one count is not affected by error and there is substantial evidence to support a verdict with respect to it, it is immaterial that there may have been errors committed in connection with another count or that there is not sufficient evidence to sustain a verdict as to such other count. [Citing cases.] One count sustained by sufficient evidence and free from error is all that is required to support a verdict. The specifications of error which the appellant has made with reference to giving and the refusal to give certain instructions, all pertain to the first cause of action and are immaterial to the second count." In the cited case the judgment in favor of the plaintiff, based upon a general verdict, was affirmed, even though a recovery under the first count could not be sustained.

This leads to the next question, the duty of a sleeping car company towards its passengers. In *Hicks* v. *Scott*, 48 Cal. App.2d 481 [120 P.2d 107], one passenger assaulted another passenger and the latter sued The Pullman Company for failing to protect him. The court said, at page 485: "A sleeping car company operating sleeping cars in connection with railway trains is not regarded as a common carrier, except where a statute so declares. (13 C.J.S. 1739, 1740.) It is, however, required, even if not a common carrier, to exercise a high degree of care for the personal safety and comfort of its passengers. (13 C.J.S. 1744.) There is a conflict among the authorities on the question whether such a company, though not technically a common carrier, should observe the same degree of care towards its passengers as a common carrier. We think the better reason is with the decisions which do require that degree of care. [Citing cases.]" ■ This case is, authority for the proposition that California holds that a sleeping car company owes the same obligation to its passengers as does a common carrier. This is in accord with the general rule.

■ The obligation of a common carrier for an assault by one of its employees upon a passenger, as distinguished from an assault by a passenger upon a fellow passenger, is stated in volume 10 of American Jurisprudence, at pages 263 to 265: "A contract of transportation implies protection to the passenger against acts of personal violence by the agents or employees of the carrier. ■ Accordingly, a carrier is liable for acts of assault and battery upon the part of its employees resulting in injury to those it has agreed to transport upon its facilities. This liability extends not only to cases where

the assault was in the line of the employee's duty, but also to those instances where the act was merely that of an individual and entirely disconnected with the performance of the agent's duties, as where the conductor of a train kisses a female passenger against her will. . . . The liability of a common carrier for an assault by one of its employees on a passenger is not dependent on the question as to whether the employee was acting within the scope of his authority or in the line of his duty, but is based upon its broad duty as a common carrier to protect its passengers from assault. Nevertheless, it is clear that the basic liability of a carrier for an assault by its employee is materially affected by the relationship of master and servant, inasmuch as the later decisions hold the carrier to practically the liability of an insurer in this respect, while it is only liable for failure to exercise a high degree of care to protect its passengers from assaults by fellow passengers or strangers. According to some authorities, this doctrine of the carrier's liability for assault is applied not only to those servants of the carrier immediately engaged in carrying out the contract of transportation but to all those engaged in the general business of transportation. Other authorities, however, while asserting the doctrine of liability for the employee's acts regardless of the scope of employment, confine its application to those agents to whom is entrusted the execution of the carrier's undertaking with the passenger, and apparently hold the carrier liable for assaults by other servants only in such instances as it would be liable for assaults by strangers.'' We are not concerned in this case with this latter point because Zeno's duties were directed solely to the comfort and protection of the passengers on his car and in his care. It was in connection with these duties that he came into intimate contact with Mrs. Berger. In volume 10 of Corpus Juris, at page 896, it is stated: ''To a female passenger a carrier owes a special duty to protect her from insulting remarks, indecent assaults, or improper liberties on the part of its employees, and it has been said that such duty should not be frittered away by nice questions as to whether the employee was acting within the scope of his employment.'' (See also 13 C.J.S. p. 1287 and cases cited in note 58, under title of ''Assault and Ravishment.'') And at page 1173 of the same volume: ''A sleeping car company is liable, like a carrier of passengers, for wrongful insults, and for assault on a passenger by an employee in charge of

the car, such as the porter . . ." ■ Numerous decisions of other jurisdictions are cited in support of the foregoing statements but our attention has not been called to any decision of the appellate courts of this state involving a sexual assault upon or an indecent proposal to a passenger by an employee of a common carrier or sleeping car company. However, we believe the law of this state should be as stated above.

■ Pullman complains that the trial court instructed the jury that, as a matter of law, Pullman was liable for the conduct of Zeno towards Mrs. Berger. The following instruction was given: "It has been established that J. V. Zeno, Jr., was an agent or employee of the Pullman Company on October 7, 1951, and as such, was acting within the scope of his authority. Thus, his conduct shall be deemed by you to have been the conduct of the corporation." The same point was involved in *Fields* v. *Sanders,* 29 Cal.2d 834 [180 P.2d 684, 172 A.L.R. 525], where the defendant truck driver struck plaintiff over the head with a large wrench during an altercation which followed a collision between the truck and plaintiff's automobile. The trial court instructed the jury that " '. . . the conduct of Fred Sanders [truck driver] shall be deemed by you to have been the conduct of Krieger Oil Company [his employer] . . .' " (P. 838.) The Supreme Court held that the issue of the scope of employment was properly withdrawn from the jury, despite the award of punitive damages against Sanders alone, which carried with it the implied finding that his act was done with malice. Another decision which indicates the modern trend is *Carr* v. *Wm. C. Crowell Co.,* 28 Cal.2d 652 [171 P.2d 5], where a carpenter employed by a general contractor struck another employee on the head with a hammer during a dispute which arose between them. The court stated, at page 657: "Not only did the altercation leading to the injury arise solely over the performance of Enloe's [the carpenter's] duties, but his entire association with plaintiff arose out of his employment on the building under construction. He had never seen plaintiff before the day preceding the accident, and had never conversed with him before the dispute over the plate." A judgment in favor of the employer was reversed. In neither of these two cases was there any special duty of protection owed by the employer to the plaintiff, as there is in the instant case. Yet because the assault in each case arose out of and because of an association or contact between two individuals brought

about by the employment, the employer was held liable for a deliberate, intentional assault. We conclude that it was proper for the trial court in the instant case to withdraw the issue of scope of employment from the jury and to instruct the jury that Zeno's conduct ''shall be deemed by you to have been the conduct of the corporation.''

Pullman contends that it was error for the trial court not to present to the jury a form of verdict which would absolve it from liability while finding against Zeno. From what has been said herein, it is clear that, under the facts of this case, the liability of Zeno and Pullman is not separable and that, if Zeno is liable, so is Pullman. Moreover, the two forms of verdict which were presented to the jury were approved beforehand by counsel for both sides, and the record does not disclose any request to present any other or additional form of verdict.

Complaint is made of the failure to give certain requested instructions on the effect of consent and resistance. There was no evidence upon which to justify an instruction on consent. Zeno denied the assault and Mrs. Berger denied having consented to one. There was no other evidence upon this subject. As to the duty to resist, Zeno testified that there was no occasion for it and Mrs. Berger testified that she was in a drugged condition and too weak to resist effectually. Evidence of nonresistance is material and it was before the jury for its consideration in determining whether an assault had taken place. But a trial court is not justified in singling out certain evidence and instructing thereon, particularly in an argumentative manner. For example, one of the instructions requested and properly refused was as follows: ''When a female is indecently assaulted or ravished, it is expected that she will follow the natural impulse of virtuous women under such circumstances and make an outcry, and also complain of the wrong done her at the first reasonable opportunity.'' No error was committed under the evidence in this case in refusing the offered instructions on consent and resistance.

Complaint is made of the giving of an instruction that a carrier is required to give special attention to the needs of a sick passenger. Appellants contend that such an instruction only relates to neglect of the passenger and not to a sexual assault. Even though this is true, appellants suffered no prejudice thereby. It helps to explain why Zeno was in

Mrs. Berger's bedroom so many times and why she left the door unlocked.

The last issue raised is that the jury's award of $21,000 is not supported by the evidence. These damages are entirely compensatory, no exemplary damages having been asked for or awarded. It is agreed that there were no marks of physical violence or injury on Mrs. Berger. She was examined two days· after the assault by her physician who was the first person to whom she told her story. He testified that his examination was negative and that his impression at that time was that an assault had not occurred. This should not be interpreted as indicating that he believed that Mrs. Berger was lying but that, as a physician, he found nothing in Mrs. Berger's condition, either physical or mental, which could be attributed to such an assault. There is a complete absence of testimony as to whether Mrs. Berger experienced any ill effects from the assault after leaving the train. At the trial, she testified that her general health had improved and that her tuberculosis had been completely cured. It was agreed that the subsequent operation to remove one lung and the ensuing year in the hospital had nothing to do with the assault.

There is not one word of testimony by Mrs. Berger or anyone else of any residual effect upon her resulting from the assault. The last mention, chronologically, of any suggestion of anything akin to hysteria or mental shock was when she was asked if she had said anything about the assault to her father-in-law, when he met her at the train in San Francisco. Her answer was: ''No, I did not. I wanted to very desperately, but I was just too ill and I couldn't get myself to say anything about it to anybody.'' The next day she did tell her physician. As before stated, there is no testimony of any mental suffering ·by Mrs. Berger after her. arrival in San Francisco.

It must be kept in mind, however, that the jury was properly instructed on the elements of damage, and that the jury and the trial judge had the opportunity to observe Mrs. Berger and Zeno and were thus in a far better position than this court to determine the effect of the assault upon her. The trial judge, in the proper exercise of his discretion, had the power to reduce or set aside the award in ruling upon the motion for a new trial, but he did not do so. All of these factors are entitled to serious consideration. It also must be kept in mind that, in a sexual assault case, it is extremely

difficult to estimate the extent of the shock and the duration of the emotional disturbance resulting from the assault. Each case must vary according to the individual involved.

Counsel for Mrs. Berger says: ''The jurors, drawing on common sense, would know that the impinge of an assault so atrocious and horrible upon a person of the physical and mental condition of Mrs. Berger would cause a terrific shock that time would never heal.'' The difficulty with accepting this statement is that there is no evidence to support it unless it can be said that such a permanent condition would necessarily, or with reasonable certainty, result. The trial was held *three years* after the assault. If, during that period, Mrs. Berger suffered any of the effects or symptoms of the shock claimed by her counsel, she could have so testified. Instead, she did not even once mention anything which would support such a claim. In addition, Mrs. Berger's physician was called by her as a witness but he was not even asked if the assault had had, in his opinion, any effect upon her. Here was a physician who had treated her continuously for one and one-half years before the assault, called upon her professionally the day after, and examined her thoroughly on the next day, after being told by her of the assault. He continued treating her for over one and one-half years after the assault. Here was a witness on the stand who was professionally qualified to express an opinion on whether there had been any after-effect upon Mrs. Berger as a result of the assault. The failure of Mrs. Berger to testify to such effect and the failure of her counsel to ask her physician about it supports an inference that such testimony, if elicited, would be unfavorable to Mrs. Berger's case.

It has been held repeatedly that damages should not be awarded upon the basis of speculation, surmise or conjecture. (14 Cal.Jur.2d 481.) However, a sexual assault, of itself, is a sufficient basis for a substantial award of damages. Furthermore, we are not to be understood as holding that plaintiff may not have been damaged in the amount awarded. The record on a retrial may well support such an amount. What we are holding is that the record presented to us is not sufficient to support an award of $21,000. The burden of proving damages to this extent was not met by the plaintiff, although it was easily within her power to produce such proof, if it existed. The plaintiff should not have put the jury in the difficult position of attempting to assess the total

damages sustained without any direct evidence thereof other than her mere account of the assault itself.

The judgment is reversed and the cause is remanded to the lower court for a retrial solely upon the issue of the amount of damages.

Bray, J., concurred.

PETERS, P. J.—I dissent.

The majority opinion fully and fairly states the facts. I agree with everything said in that opinion except what is said on the issue of damages. On that issue the majority hold that there was a failure of proof. I disagree.

I agree that the burden was on the plaintiff to prove all elements of her case, and that she had the burden of proving, with reasonable certainty, the damages suffered by her. It is also undoubtedly true that neither plaintiff nor her witnesses testified as to any lasting after effects caused by the assault. But it does not follow that there was a failure of proof. Suppose the plaintiff had testified that three years after the assault there were no discernible aftereffects. Would that mean that she could recover no damages at all? Would that mean that there had been a failure of proof on the issue of damages? Of course not.

The jury was informed of the facts of the case. The plaintiff testified that after the assault she was too shocked to report it. The jury knew that the plaintiff was a delicate, sickly woman who had been sexually assaulted by a pullman porter. The plaintiff testified in detail as to her physical condition before and at the time of the assault. The jury did not have to be told that a forceable rape is, under such circumstances, a revolting and humiliating experience. The jury observed the plaintiff during the trial. This was itself evidence. The jury could tell whether she was or was not a woman of fine sensibilities. The jury, composed of mature men and women, could properly determine for themselves the effect of the assault upon such a woman. The trial judge also saw and observed the plaintiff. He denied a motion for a new trial. He, too, must be presumed to have determined that the rape of this plaintiff was a revolting experience. Under these circumstances, to hold that there is no evidence of damage, or that the verdict is unsupported, is to substitute the views of two appellate justices on a factual issue for the find-

ings of the jury and trial judge. That is contrary to well-settled principles.

I would affirm the judgment in all respects.

A petition for a rehearing was denied September 14, 1956. Peters, P. J., was of the opinion that the petition should be granted.