[Civ. No. 13962. Fourth Dist., Div. Two. Aug. 12, 1975.]

JOHNNIE A. RODGERS et al., Plaintiffs and Respondents, v.
KEMPER CONSTRUCTION COMPANY,
Defendant and Appellant.

614

**COUNSEL**

King & Mussell and Joseph Arias for Defendant and Appellant.

Kearney & Miller and Matthew M. Kearney for Plaintiffs and Respondents.

**OPINION**

**TAMURA, Acting P. J.**—A subcontractor on a construction project appeals from a judgment entered on a jury verdict holding it liable for injuries sustained by two employees of the general contractor as a result of an assault committed upon them by employees of the subcontractor.

The assault occurred at the site of the state's Cedar Springs Dam project. Plaintiffs (Rodgers and Kelley) were employed as heavy equipment operators by the general contractor for the project. Defendant Kemper Construction Co. (Kemper) was a subcontractor on the same job. Defendants Herd and O'Brien were employees of Kemper.

Kemper maintained its office in a movable trailer on the job site. Near the office trailer was a "dry house" trailer equipped with a shower room and lockers for Kemper's employees. Kemper's subcontract involved construction of tunnels and other work under the spillway. Its employees wore special clothing which they kept in the dry house lockers. After work Kemper's employees usually showered before putting on their own clothing.

Work on the Cedar Springs project continued around the clock during the week but no work was performed on Saturday or Sunday. Kemper's employees worked in three shifts, the day shift from 8 a.m. to 4 p.m., the swing shift from 4 p.m. to 12 midnight, and the night shift from 12 midnight to 8 a.m. When in need of extra help, Kemper's supervisors would sometimes look in the dry house to see whether any of the men who had just completed a shift would be willing to work overtime.

Although the dry house had a sign prohibiting alcohol, it was not unusual for the men to drink beer there after a shift. Particularly on Friday nights there was usually beer in the dry house. Kemper's supervisors made no effort to stop the drinking and in fact they frequently joined in.

On Friday, July 18, 1969, Herd and O'Brien worked the day shift for Kemper, ending at 4 p.m. After work they went to the dry house, changed clothes, and then worked on O'Brien's pickup in the Kemper parking area adjacent to the dry house. There was beer in a styrofoam chest in the dry house and Herd and O'Brien had three or four beers each. Dieffenbauch, Kemper's office manager, was present and also drank beer.

About 8 p.m. Herd and O'Brien set out on foot across the job site to look for a friend from whom they planned to borrow money to continue drinking in a nearby town. Herd and O'Brien approached Rodgers who was operating a bulldozer on the spillway and signaled him to stop. O'Brien climbed on the tractor and asked Rodgers for a ride which Rodgers refused because it was against regulations. Both Herd and O'Brien then fell on Rodgers, beating him with their fists and with rocks.

When the two men left, Rodgers drove to where Kelley was working and asked for help in obtaining the identities of the assailants. Rodgers and Kelley proceeded to the Kemper parking area where they saw Herd and O'Brien getting into O'Brien's pickup. As Rodgers began to write

down the license number of the pickup, O'Brien got out and hit Kelley knocking him down. Rodgers threw a rock at O'Brien which missed and cracked the windshield of the pickup. Herd got out and began fighting with Rodgers. At this point Dieffenbauch entered the scene and hit Rodgers from behind rendering him unconscious. Herd beat Kelley about the head with a hard hat and Dieffenbauch jumped on Kelley's legs and kicked them. The fight ended when another employee of the general contractor arrived and managed to remove Rodgers and Kelley.

Rodgers sustained serious multiple injuries to his right hip, left shoulder and low back necessitating numerous surgeries. He has been permanently disabled from working as a heavy equipment operator. Kelley sustained a permanent diplopia (double vision) requiring corrective lenses. The jury returned a verdict in favor of Rodgers and against Kemper, Herd and O'Brien in the sum of $220,442.07, and in favor of Kelley and against the same defendants in the sum of $1,500. Kemper appeals from the judgment on the jury verdict.[1]

Kemper's numerous contentions on appeal may be classified as follows: (1) Insufficient evidence that Herd and O'Brien were the aggressors; (2) insufficient evidence to establish Kemper's liability for the acts of Herd and O'Brien; (3) prejudicial misconduct by counsel for plaintiffs; (4) erroneous rulings relating to admissibility of evidence; (5) erroneous rulings relating to a complaint in intervention by the general contractor's workers' compensation insurer; and (6) errors relating to jury instructions. We have concluded that the contentions lack merit and that the judgment should be affirmed.

I

Kemper contends that the only reasonable inference to be drawn from the evidence is that plaintiff Rodgers was the aggressor and is, therefore, barred from recovery either on the theory that he consented to the subsequent injuries or on the theory that Herd and O'Brien acted in self-defense.

Kemper apparently concedes there is substantial evidence that in the altercation at Rodgers' tractor Herd and O'Brien were the aggressors. However, it argues that thereafter Rodgers and Kelley pursued Herd and O'Brien seeking revenge and provoked a second fight by throwing a rock at the pickup. In presenting this argument, Kemper only recites the

---

[1]Herd and O'Brien have not appealed.

evidence favorable to it and ignores the evidence supporting the jury's implied finding. On these issues the evidence consisted of the trial testimony of Rodgers and Kelley, statements they gave to a deputy sheriff shortly after the incident, and the deposition of O'Brien. There is substantial evidence that Rodgers and Kelley were not seeking revenge. They repeatedly testified their only thought was to find out who the assailants were by obtaining a car license number. Rodgers admitted throwing the rock but consistently stated he did so only because O'Brien had gotten out of the pickup and was threatening Kelley. As there was nothing inherently improbable in plaintiffs' version of the events, under the well-known standards of appellate review, we must accept the jury's implied finding that O'Brien and Herd were the aggressors throughout the encounter.

## II

At trial plaintiffs offered and the jury was instructed on three alternative theories for holding Kemper liable for the acts of Herd and O'Brien: *Respondeat superior,* ratification, and breach of a statutory duty to provide a safe place of employment. Kemper contends that none of these theories is supported by substantial evidence.

From the analysis which follows, we have concluded there is substantial evidence in support of Kemper's liability under the doctrine of *respondeat superior.* It is therefore unnecessary to the disposition of this appeal to involve ourselves in a discussion of the novel and complex issues tendered by the other theories. (See *Chabot* v. *Meredith,* 15 Cal.App.3d 950, 958 [93 Cal.Rptr. 543], concurring opn. of Justice Friedman.) ■ Where, as here, special verdicts were not requested or used, it may be assumed from the general verdict that the jury found in accordance with the theory supported by substantial evidence. (*Codekas* v. *Dyna-Lift Co.,* 48 Cal.App.3d 20, 24-25 [121 Cal.Rptr. 121]; *McCloud* v. *Roy Riegels Chemicals,* 20 Cal.App.3d 928, 935-936 [97 Cal.Rptr. 910]; *Jones* v. *Evans,* 4 Cal.App.3d 115, 119 [84 Cal.Rptr. 6].) The party attacking the sufficiency of the evidence to support the verdict, in this case Kemper, is the one who should have requested special verdicts. (*Codekas* v. *Dyna-Lift Co., supra,* at p. 25; *McCloud* v. *Roy Riegels Chemicals, supra,* at p. 937.)

■ Under *respondeat superior,* an employer is vicariously liable for the torts of his employees committed within the scope of the employ-

ment.[2] The doctrine, which departs from the normal tort principle that liability follows fault, is an ancient one but its scope and stated rationale have varied widely from period to period. (See 2 Harper & James, The Law of Torts, pp. 1361-1374; Prosser, Torts (4th ed. 1971) pp. 458-459.) It has been aptly stated that "Respondeat superior has long been a rule in search of a guiding rationale." (Note, 82 Harv.L.Rev. 1568, 1569.)

California has adopted the rationale that the employer's liability should extend beyond his actual or possible control over the employees to include risks inherent in or created by the enterprise because he, rather than the innocent injured party, is best able to spread the risk through prices, rates or liability insurance. (*Hinman* v. *Westinghouse Elec. Co.,* 2 Cal.3d 956, 959-960 [88 Cal.Rptr. 188, 471 P.2d 988]; *Johnston* v. *Long,* 30 Cal.2d 54, 63-64 [181 P.2d 645]; *Fields* v. *Sanders,* 29 Cal.2d 834, 841 [180 P.2d 684, 172 A.L.R. 525]; *Carr* v. *Wm. C. Crowell Co.,* 28 Cal.2d 652, 655-656 [171 P.2d 5]; *Strait* v. *Hale Constr. Co.,* 26 Cal.App.3d 941, 948-949 [103 Cal.Rptr. 487].) In some respects this rationale is akin to that underlying the modern doctrine of strict tort liability for defective products. (See *Escola* v. *Coca Cola Bottling Co.,* 24 Cal.2d 453, 461-462 [150 P.2d 436], concurring opn. of Traynor, J.; *Greenman* v. *Yuba Power Products, Inc.,* 59 Cal.2d 57, 63 [27 Cal.Rptr. 697, 377 P.2d 897, 13 A.L.R.3d 1049].) But this does not mean that *respondeat superior* is merely a justification for reaching a "deep pocket" or that it is based only upon an elaborate economic theory regarding optimal resource allocation. It is grounded upon "a deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities." (*Ira S. Bushey & Sons, Inc.* v. *United States,* 398 F.2d 167, 171, noted in 82 Harv.L.Rev. 1568-1575. See generally, Keeton, *Conditional Fault in the Law of Torts,* 72 Harv.L.Rev. 401.)

One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity. However, "foreseeability" in this context must be distinguished from "foreseeability" as a test for negligence. In the latter sense "foreseeable" means a level of probability which would lead a prudent person to take effective precautions whereas

---

[2]In California the doctrine is codified in Civil Code section 2338 which provides: "Unless required by or under the authority of law to employ that particular agent, a principal is responsible to third persons for the negligence of his agent in the transaction of the business of the agency, including wrongful acts committed by such agent in and as a part of the transaction of such business, and for his willful omission to fulfill the obligations of the principal."

"foreseeability" as a test for *respondeat superior* merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. (2 Harper & James, The Law of Torts, pp. 1377-1378. See *Ira S. Bushey & Sons, Inc.* v. *United States, supra,* at pp. 171-172.) In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one "that may fairly be regarded as typical of or broadly incidental" to the enterprise undertaken by the employer. (2 Harper & James, The Law of Torts, p. 1376.)

Under the modern rationale for *respondeat superior,* the test for determining whether an employer is vicariously liable for the tortious conduct of his employee is closely related to the test applied in workers' compensation cases for determining whether an injury arose out of or in the course of employment. (*Hinman* v. *Westinghouse Elec. Co., supra,* 2 Cal.3d 956, 962, fn. 3.) This must necessarily be so because the theoretical basis for placing the loss on the employer in both the tort and workers' compensation fields is the allocation of the economic cost of an injury resulting from a risk incident to the enterprise. (*Huntsinger* v. *Glass Containers Corp.,* 22 Cal.App.3d 803, 808 [99 Cal.Rptr. 666]; 2 Harper & James, The Law of Torts, pp. 1376-1378.) Consequently, our high court has on many occasions relied upon workers' compensation cases in tort cases. (E.g., *Hinman* v. *Westinghouse Elec. Co., supra,* at pp. 961-962; *George* v. *Bekins Van & Storage Co.,* 33 Cal.2d 834, 843 [205 P.2d 1037]; *Fields* v. *Sanders, supra,* 29 Cal.2d 834, 841; *Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal.2d 652, 656.) Since the instant case involves an unusual factual situation which, to our knowledge, has never been previously considered by a reviewing court, it is particularly appropriate and instructive to draw on the experience in the workers' compensation field. We shall do so in the ensuing discussion.

Turning to the present case, Kemper contends the evidence fails to establish its liability under *respondeat superior* because: (a) The assault occurred after Herd and O'Brien had completed their work shift and (b) the assault was the result of personal malice unrelated to the work. Those contentions must be rejected.

Although on the day in question Herd and O'Brien had finished their shift at 4 p.m., they were still on the job site when the fight occurred sometime between 8 and 9 p.m. There was evidence that as a matter of mutual convenience, Kemper customarily permitted its employees to remain on the premises in or about the dry house long after their work

shift had ended. When Kemper needed additional workers for later shifts, it frequently contacted employees who remained in or about the dry house. It was customary, particularly on Friday evenings, for employees to sit around the dry house after their work shift and talk and drink beer, often, as on the evening in question, joined by their supervisors.

In the field of workers' compensation under varied circumstances an employee may be acting in the scope of employment even though the injury occurred during an off-duty period. Thus, an employee has been held to be acting within the scope of employment while properly traversing the employer's premises in going to or returning from work so long as there is no unreasonable delay. (*Peterson* v. *Moran,* 111 Cal.App.2d 766, 768 [245 P.2d 540]. See *Greydanus* v. *Industrial Acc. Com.,* 63 Cal.2d 490 [47 Cal.Rptr. 384, 407 P.2d 296]; *Van Cleve* v. *Workmen's Comp. App. Bd.,* 261 Cal.App.2d 228 [67 Cal.Rptr. 757]; *Bethlehem Steel Co.* v. *Ind. Acc. Com.,* 70 Cal.App.2d 382 [161 P.2d 59].) And, under the "bunkhouse rule," an employee who lives on his employer's premises may be acting within the scope of his employment even while engaged in leisure pursuits on an off-duty day provided the employee is making a reasonable use of the employer's premises.[3] (*Argonaut Ins. Co.* v. *Workmen's Comp. App. Bd.,* 247 Cal.App.2d 669, 677-678 [55 Cal.Rptr. 810].) Our Supreme Court recently held that where social or recreational pursuits on the employer's premises after hours are endorsed by the express or implied permission of the employer and are "conceivably" of some benefit to the employer *or,* even in the absence of proof of benefit, if such activities have become "a customary incident of the employment relationship," an employee engaged in such pursuits after hours is still acting within the scope of his employment. (*McCarty* v. *Workmen's Comp. Appeals Bd.,* 12 Cal.3d 677, 681-683 [117 Cal.Rptr. 65, 527 P.2d 617].)

In the case at bench, it was neither unusual nor unreasonable for Herd and O'Brien to be on the job site at the time the incident occurred. Their continued presence after completion of their work shift was "conceivably" of some benefit to Kemper. It was a convenience to Kemper to be able to recruit additional help by simply contacting employees remaining in or about the job site. Also, apart from benefit to the employer, there was substantial evidence that the after-hours social activity in and about

[3] Herd and O'Brien, like the majority of workers in their field, traveled widely from job site to job site, taking up temporary quarters in a nearby town. In their nomadic profession, social ties centered on the job site in a peculiar way, giving it some of the attributes normally associated with home.

the dry house—talking and drinking beer—was with the express or implied permission of the employer and was a customary incident of the employment relationship. Thus, the mere fact that the assault occurred after working hours does not compel the conclusion that it occurred outside the scope of employment.

Nor does the evidence establish, as a matter of law, that the assault was the result of personal malice unconnected with the employment relationship.

*Respondeat superior* includes liability for an employee's intentional tort as well as negligence. Traditionally, before an employer could be held vicariously liable for an employee's assault, proof was required that the employee intended to benefit or further the interest of the employer. (See 2 Harper & James, The Law of Torts, p. 1392.) However, the "motive test," though still the "majority rule," has been abandoned in California. (*Fields* v. *Sanders, supra,* 29 Cal.2d 834, 838-839; *Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal.2d 652, 654; Note, 35 Cal.L.Rev. 126-128) and by federal courts applying federal tort law (*Ira S. Bushey & Sons, Inc.* v. *United States, supra,* 398 F.2d 167, 170-171.) In this state, the test applied is virtually identical to that used for an employee's negligent torts. If the assault was motivated by personal malice not engendered by the employment, the employer is not vicariously liable; but otherwise, liability may be found if the injury results from "a dispute arising out of the employment." (*Carr* v. *Wm. C. Crowell Co., supra,* at p. 654.)

In the case at bench, there was no evidence of personal malice unrelated to the employment. In *Carr* v. *Wm. C. Crowell Co., supra,* an employee of a general building contractor became angry with an employee of a subcontractor and threw a hammer at him, causing serious injuries. Affirming judgment against the general contractor, the Supreme Court explained there could be no personal malice where the assailant and his victim were strangers: "Not only did the altercation leading to the injury arise solely over the performance of Enloe's duties, but his entire association with plaintiff arose out of his employment on the building under construction. He had never seen plaintiff before the day preceding the accident, and had never conversed with him before the dispute . . . " (28 Cal.2d 652, at p. 657.) So also in the case at bench, Rodgers and Kelley, as they testified, were complete strangers to Herd and O'Brien.

Not only was there a lack of evidence of personal malice, there was substantial evidence that the dispute which was the proximate cause of

the assault arose out of the employment. The initial conflict resulted from O'Brien's request for a ride on Rodgers' bulldozer. The jury could permissibly infer from O'Brien's testimony that he believed his status as an employee of the subcontractor carried with it the fringe benefit of free rides on the general contractor's heavy equipment.[4] When Rodgers refused to recognize this perquisite, taking the position that all free rides were forbidden, O'Brien apparently lost his temper. Had O'Brien not been employed on that project, had he been a mere visitor, it may be inferred that he would not have felt privileged to ask for a ride or, if he did, would not have been so deeply offended at Rodgers' refusal. As previously mentioned, California does not require that an employee intend by his assault to benefit the employer.

In holding that the assault in *Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal.2d 652, was an outgrowth of the employment, the court observed: "[D]efendant's enterprise required an association of employees with third parties, attended by the risk that someone might be injured. 'The risk of such associations and conditions were risks of the employment.' (Cardozo, J., in *Leonbruno* v. *Champlain Silk Mills,* 229 N.Y. 470, 472 [128 N.E. 711, 13 A.L.R. 522].) Such associations 'include the faults and derelictions of human beings as well as their virtues and obediences. Men do not discard their personal qualities when they go to work. Into the job they carry their intelligence, skill, habits of care and rectitude. Just as inevitably they take along also their tendencies to carelessness and camaraderie, as well as emotional makeup. . . . These expressions of human nature are incidents inseparable from working together. They involve risks of injury and these risks are inherent in the working environment.' [Citations.]" (*Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal.2d 652, 656. See also *Fields* v. *Sanders, supra,* 29 Cal.2d 834, 841 [employer liable for an assault by its truck driver on a motorist resulting from a collision on a highway].)

In the instant case, it was reasonably to be expected that Kemper's employees would come in contact with employees of other contractors on the same project. The risk of such association, as explained in *Carr* and *Fields,* extends to expressions of normal human traits which, unhappily,

[1]The following is from O'Brien's deposition as read to the jury:
"Q What did you say to him [Rodgers], to the best of your recollection?
"A Well, I don't remember exactly, but I asked him if he'd take us down to where the air tracks were, and I didn't think it was any big deal. I've worked on a lot of jobs—
"Q Let's take one thing at a time.
"A Okay, okay. And he said, 'No, get off my Cat,' and I tried to explain to him that we worked across the street and that we weren't causing any trouble, doing anything; we just wanted a ride, and he said, 'No, get off the Cat,' . . ."

include occasional emotional flareups and propensity for violence. In the case at bench the quarrel on the job site, though between employees of different contractors, arose over the rights and privileges of Kemper's off-duty employees. It was manifestly an outgrowth of the employment relationship and a risk which may fairly be considered as typical of, or incidental to, the employment. The incident which led to plaintiff's injuries was such as might normally be expected to occur during the course of a major construction job.

Kemper relies on *Yates* v. *Taft Lodge No. 1527,* 6 Cal.App.2d 389 [44 P.2d 409], and *Lane* v. *Safeway Stores, Inc.,* 33 Cal.App.2d 169 [91 P.2d 160]. In *Yates,* the defendant rented picnic grounds from the plaintiff for a single day and hired one Dear as gatekeeper for that day. While so engaged, Dear became embroiled in an argument with plaintiff-landlord about the terms of the lease during the course of which Dear assaulted the plaintiff. Defendant's demurrer to plaintiff's complaint was sustained and the ensuing judgment of dismissal was affirmed on appeal on the ground that Dear was not acting within the scope of his employment. Although *Yates* had never been overruled, it is inconsistent with the spirit of *Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal.2d 652, *Fields* v. *Sanders, supra,* 29 Cal.2d 834, and other more recent decisions and has been distinguished in a number of later cases (see *Sullivan* v. *Matt,* 130 Cal.App.2d 134, 139-141 [278 P.2d 499]; *Haworth* v. *Elliott,* 67 Cal.App.2d 77, 81-82 [153 P.2d 804]; and *Hiroshima* v. *Pacific Gas & Elec. Co.,* 18 Cal.App.2d 24, 28 [63 P.2d 340]). The precedential value of *Yates* has thus been eroded.

In *Lane* v. *Safeway Stores, Inc., supra,* 33 Cal.App.2d 169, plaintiff, a nine-year old boy, was sent to defendant store to purchase an item. While consummating the purchase, he was kicked by the clerk. In a nonjury trial, the court found in favor of plaintiff and against the clerk but found in favor of Safeway on the ground the clerk was not acting in the scope of his employment. The trial judge commented that it appeared the boy was "fooling around this store" and was "mischievous" and that the clerk merely kicked him playfully. The appellate court affirmed the judgment on the ground the clerk was acting outside the scope of his employment when he engaged in horseplay with the customer. The court cited as its principal authority *Stephenson* v. *Southern Pac. Co.,* 93 Cal. 558 [29 P. 234]. However, *Stephenson* was expressly overruled in *Carr* v. *Wm. C. Crowell Co., supra,* 28 Cal.2d 652,

at page 656, as being contrary to the course of subsequent decisions.[5] *Lane* is therefore no longer a valid precedent.

Although the facts in the instant case are somewhat unusual and there appears to be no case authority precisely in point, we conclude that the jury's implied finding of Kemper's liability under *respondeat superior* is consistent with the current rationale for the doctrine and is supported by substantial evidence.

## III

Kemper charges plaintiffs' counsel with two acts of prejudicial misconduct. ■ The first concerns the request of plaintiffs' counsel in the jury's presence for the production of a written statement given by a witness which was in the possession of Kemper's attorney and which the trial judge had previously ruled to be within the attorney-client privilege. The witness was a Kemper employee who was on the job site when the fight occurred. Kemper argues that the request was made in bad faith for the sole purpose of giving the jury the impression that Kemper was withholding relevant evidence favorable to plaintiffs. We disagree.

The statement was taken by an investigator for Kemper's liability insurer. Plaintiffs had previously sought discovery of the statement on the ground the witness was functionally unavailable since he had subsequently suffered memory loss as a result of head injuries. Kemper initially resisted discovery on the ground the statement was attorney work product but when the judge rejected that contention, Kemper argued the statement was covered by the attorney-client privilege. The latter theory ultimately persuaded the judge and discovery was denied.

During their case in chief, plaintiffs called the employee and asked him what he remembered about the fight. In the course of the examination, the witness said he had consulted his statement on the previous day and it had refreshed his memory. At this point plaintiffs' attorney asked, "Your Honor, may I have the statement at this time?" As it turned out, the witness had not consulted the statement given to the insurance investigator but rather his deposition taken at a much later date.

---

[5]Kemper also cites *Monty* v. *Orlandi,* 169 Cal.App.2d 620 [337 P.2d 861]. *Orlandi* merely held that the trial court correctly left to the jury the question whether an assault by a bartender was committed in the course of his employment. There was evidence that the assault was occasioned by a dispute over a personal matter.

On the basis of his knowledge at that time, it appears that plaintiffs' attorney was acting in good faith. The request was justified since the trial judge had not ruled on whether the attorney-client privilege would protect the statement if it was used to refresh the witness' memory. In making the request, plaintiffs' counsel used only the quoted language. He made no reference to Kemper or defense counsel, much less a charge of suppressing evidence. We agree with the judge's assessment of the motive behind the request. When defense counsel requested the judge to cite plaintiffs' attorney for misconduct, the judge declined, stating: "I don't feel that it was done with the intent to embarrass you, Mr. Burford. The way the testimony developed it did appear that he [the witness] was referring to the statement."

■ The second act of alleged misconduct was counsel's statement in closing argument that ". . . obviously the Kemper Construction Company was out there to make a profit." Defendant's objection was overruled. Kemper asserts the statement was an improper appeal to the jury's "economic prejudices." We find no merit in this contention. A deliberate attempt by counsel to appeal to social or economic prejudices of the jury, including the wealth or poverty of litigants, is misconduct where the asserted wealth or poverty is not relevant to the issues of the case. (*Hoffman* v. *Brandt*, 65 Cal.2d 549, 552-553 [55 Cal.Rptr. 417, 421 P.2d 425].) The statement in question, which was not elaborated upon or repeated, did not, in the context in which it was made, pass the bounds of permissible argument. It cannot be reasonably construed as an appeal to the jury to award large damages because defendant was rich and could afford to pay it.

## IV

Defendant complains of certain evidentiary rulings.

After the fight had occurred, the sheriff's office was notified and Officer Weis was dispatched to investigate. At trial Officer Weis, testifying for plaintiffs, related what he saw and heard in the course of his investigation. On cross-examination, Kemper's attorney asked whether in the report which Officer Weis prepared he used the terms "victims" to refer to Rodgers and Kelley and "suspects" to refer to Herd and O'Brien. When Officer Weis replied in the affirmative, he was asked what the terms meant. Officer Weis explained that "victim" meant victim of the crime and "suspect" meant the person suspected of committing the crime. Defense counsel then inquired: "So the only persons that you, after investigating this case, that you felt were the persons that caused the

fight were Mr. O'Brien and Mr. Herd; is that correct?" Counsel for plaintiffs objected that the question called for an opinion of the witness and the objection was quite properly sustained.

Kemper now contends the question was necessary to clarify the terms "suspect" and "victim." However, during extensive testimony on direct examination, Officer Weis never used the term "victim" and only once used the term "suspect"; the subject of the terminology used was brought out by defendant on cross-examination. The trial court's ruling was directed only to the question as framed. The meaning of the terms could have been explored by proper questions directed to the reasons for their use in the general context of police practices rather than by asking for the witness' opinion concerning the fault of the parties involved.

Kemper also maintains the trial court erred in admitting medical bills as evidence of plaintiffs' expenses incurred for treatment of injuries inflicted by Herd and O'Brien. Kemper asserts the bills were hearsay and that a proper foundation for their admission was not laid under the business records exception to the hearsay rule. The contention lacks merit.

Plaintiffs put on extensive expert medical testimony regarding the nature of their injuries and the treatment they had received. Before the medical bills were introduced, each plaintiff identified his bills individually, stating what each was for and the amount of each which had been paid. In support of the validity of this procedure, plaintiffs rely on *Pacific Gas & E. Co.* v. *G. W. Thomas Drayage etc. Co.,* 69 Cal.2d 33 [69 Cal.Rptr. 561, 442 P.2d 641, 40 A.L.R.3d 1373], where the Supreme Court stated, at pages 42-43: "Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or that the charges were reasonable. [Citations.] If, however, a party testifies that he incurred or discharged a liability for repairs, any of these documents may be admitted for the limited purpose of corroborating his testimony [citations], and if the charges were paid, the testimony and documents are evidence that the charges were reasonable. [Citations.]"

We agree that plaintiffs complied with the requirements set forth by our Supreme Court and that the bills were properly admitted to corroborate the plaintiffs' testimony. The expert testimony supplied evidence that the treatments were reasonably necessary for the injuries resulting from the fight.. Plaintiffs' testimony adequately tied the bills to

the treatments previously described and their testimony regarding payment tended to show the charges were reasonable.

V

We next consider defendant's attack upon certain rulings of the trial court in connection with a complaint in intervention by the workers' compensation carrier for plaintiffs' employer.

The complaint in intervention was filed for reimbursement for sums paid to plaintiffs as compensation benefits. Kemper filed an answer thereto in which it asserted as an affirmative defense that "whatever injury, if any, and whatever damage, if any, Plaintiffs sustained . . . were directly and proximately caused and contributed to by the negligence, carelessness and recklessness of Plaintiffs themselves." The intervenor did not follow up its complaint. It was not represented at trial and, as will be mentioned later, requested dismissal of its complaint shortly before the trial ended.

At the close of plaintiffs' case, an *in camera* hearing was held to determine whether defendants should be allowed to introduce evidence of workers' compensation benefits received by plaintiffs. Defendant relied on *Witt* v. *Jackson,* 57 Cal.2d 57 [17 Cal.Rptr. 369, 366 P.2d 641], which held that where a third party tortfeasor pleads and proves concurrent negligence on the part of the plaintiff's employer, the employer may not share in the employee's recovery and consequently, to prevent double recovery by the employee, judgment against the third party must be reduced by the amount of any workers' compensation benefits which the plaintiff has received from the employer. Plaintiffs objected that defendant's pleadings did not raise a *Witt* v. *Jackson* defense and, in any event, defendant would not be able to produce any evidence of negligence on the part of the general contractor since none existed. To the first objection, defendant made the following ingenious reply. Each plaintiff was an employee acting within the scope of his employment so that a negligent act by either which proximately caused injury *to the other* would be an act attributable to the employer under the doctrine of *respondeat superior.* Thus, the allegation in the answer to the complaint in intervention that "plaintiffs" were negligent necessarily implied negligence on the part of their employer. Rejecting this theory, the court ruled "that there is no defense raised to create an issue under the *Witt* v. *Jackson* doctrine."

The flaw in defendant's argument is that its affirmative defense contained no allegation that plaintiffs' negligent acts were committed within the scope of their employment. More fundamentally, the pleading appeared to raise an entirely different defense, contributory negligence, and hence was patently misleading. (See *Inouye* v. *Pacific Gas & Elec. Co.,* 53 Cal.2d 361, 366-368 [1 Cal.Rptr. 848, 348 P.2d 208].) Kemper's answer, without the benefit of a strained interpretation, did not give reasonable notice that a *Witt* v. *Jackson* defense was being asserted. The trial judge's ruling was proper.

Following the court's ruling, defendant requested leave to amend its answer in order to raise the issue of concurrent negligence by plaintiffs' employer. The request was denied and defendant again assigns error.

The ruling was correct. Trial courts have considerable discretion to allow amendment of pleadings, even after trial has commenced, if the amendment would be "in the furtherance of justice." (Code Civ. Proc., § 576.) A consideration of prime importance is the potential prejudice to an adverse party. Here, it would have been manifestly unfair to plaintiffs' employer to allow its negligence to be injected as an issue in the middle of a trial in which it had taken no part. To prevent this very situation from occurring, another Court of Appeal has expressed the view that if the issue of an employer's negligence is to be raised as a defense to a claim by a plaintiff-employee, then such defense ought to be asserted in a pleading filed and served upon the employer not later than the date of either the pretrial or the trial setting conference. (*Brandon* v. *Santa Rita Technology, Inc.,* 25 Cal.App.3d 838, 846 [102 Cal.Rptr. 225].) Furthermore, it was incumbent upon defendant to demonstrate to the trial judge that its new defense was a creature of substance. In the face of the trial judge's announced skepticism, which was justified in view of the evidence presented by plaintiffs, Kemper did not indicate what evidence, if any, it was prepared to produce on this issue. The trial judge did not abuse his discretion, therefore, in concluding that the proposed amendment would not be "in the furtherance of justice."

A few days later the complaint in intervention was dismissed by the trial judge at the request of the intervenor. We see no merit in defendant's objection to this action. Defendant could not have been prejudiced since the *Witt* v. *Jackson* defense had not been made an issue in the case.

## VI

Kemper attacks the jury instructions on several grounds, the first being that instructions were given on issues having no evidentiary support.

■■■ As previously noted, Kemper contends there was no substantial evidence to support the plaintiffs' alternative theories of *respondeat superior,* ratification and breach of a statutory duty. In conjunction with this earlier contention, Kemper also urges it was error to instruct on these theories.

As we have already demonstrated, the record contains substantial evidence to support the verdict on the theory of *respondeat superior.* As for the other theories, there is no need for an elaborate review of the evidence.[6] Assuming, *arguendo,* that the evidence failed to support liability under those theories, Kemper has failed to demonstrate any potential prejudice from the instructions. An instruction which relates to matters as to which there is no evidence will not justify a reversal unless it has misled the jury to the prejudice of the appellant. (*Gillespie* v. *Rawlings,* 49 Cal.2d 359, 369 [317 P.2d 601]; *Price* v. *Bekins Van & Storage Co.,* 179 Cal. 326, 328 [176 P. 452]; *Posz* v. *Burchell,* 209 Cal.App.2d 324, 336-337 [25 Cal.Rptr. 896]; *Trelut* v. *Kazarian,* 110 Cal.App.2d 506, 512 [243 P.2d 104].) The same principle applies to Kemper's contention that BAJI No. 3.40, relating to the standard of care required of one working in a dangerous situation, should not have been given[7] and to its attack upon the rendition of an instruction pertaining to an employer's duty to provide a safe place of employment.[8] The jury was

[6]As to ratification, plaintiffs relied primarily on O'Brien's deposition in which he said he and Herd met with Kemper supervisors the day after the incident and were told "we had nothing to worry about, that we weren't in the wrong, and that they'd straighten everything out, and . . . we were to come back to work." The charge of violation of a statutory duty to provide a safe place of employment centered on Kemper's practice of allowing its employees to drink beer on the job site.

[7]BAJI No. 3.40 provides: "When a person's lawful employment requires that he work in a dangerous location or a place that involves unusual possibilities of injury, or requires that in the line of his duty he take risks which ordinarily a reasonably prudent person would avoid, the necessities of such a situation, insofar as they limit the caution that he can take for his own safety, lessen the amount of caution required of him by law in the exercise of ordinary care."

[8]The instruction which Kemper attacks stated that section 6400 of the Labor Code requires that "Every employer shall furnish employment and a place of employment which are safe for the employees therein." Kemper complains that the instruction led the jury to believe it had a duty to make safe premises over which it had no control. The meaning of "place of employment" in the context of the case at bench was explained by the instruction: "Any contractor owes to the employees of any other contractor a duty to exercise reasonable care to keep the premises over which the contractor has control in a

instructed that all the instructions given were not necessarily applicable and that applicability of some of the instructions would depend upon what the jury found to be the facts. (BAJI No. 15.22.) It is presumed that the jury followed that instruction.

Kemper next complains that an instruction regarding burden of proof may have confused the jury. The instruction stated that plaintiffs had the burden of proof on the issue "whether employees of Kemper Construction Company were acting within the course and scope of their employment." According to Kemper, the trial judge should have identified the employees referred to.

■ It is elementary that in determining whether the jury was properly instructed, the instructions taken as a whole must be considered. (*Woodcock* v. *Fontana Scaffolding & Equip. Co.,* 69 Cal.2d 452, 457-458 [72 Cal.Rptr. 217, 445 P.2d 881]; *Trelut* v. *Kazarian, supra,* 110 Cal.App.2d 506, 512.) It has also been recognized that an ambiguity in one instruction may be cured by another more explicit instruction which correctly states the applicable legal principles. (*Waller* v. *Southern Pacific Co.,* 66 Cal.2d 201, 213 [57 Cal.Rptr. 353, 424 P.2d 937]; *Valentine* v. *Provident Mut. L. Ins. Co.,* 12 Cal.App.2d 616, 618-622 [55 P.2d 1243].) In view of the detailed instructions given on scope of employment, quoted in the margin,[9] the jury could not have been misled by the instruction on burden of proof.

Finally, Kemper complains that its attorney was not permitted to examine the jury instructions before making his final argument. This assertion is not supported by the record.

---

reasonably safe condition and to provide a safe place for such employees to work. . . ." Read as a whole, the instructions would not lead the jury to believe that Kemper had a duty to make safe premises over which it had no control.

[9]The jury was instructed as follows:

"One theory that the defendant Kemper Construction Company has been sued on, is the theory that it was the principal and that the defendants, Herd and O'Brien, were its agents.

"If you determine that defendants Herd and O'Brien [were the agents of defendant Kemper Construction Company [and] were acting within the scope of their employment] at the time of the events out of which the accident occurred, and if you find that defendants Herd and O'Brien are liable, then defendant Kemper Construction Company is liable. But if you find that defendants Herd and O'Brien are not liable, then defendant Kemper Construction Company is not liable.

"However, if you determine that defendants Herd and O'Brien are liable but were not acting within the scope of their employment at such time, then you must find that the defendant Kemper Construction Company is not liable.

"This instruction applies only to this theory of the plaintiffs' case and is inapplicable to the alternative theory that defendant Kemper Construction Company was itself negligent."

After both sides had rested, a conference was held in the judge's chambers to discuss jury instructions. Counsel for Kemper requested the presence of a court reporter and when the request was denied, he left the meeting. The record does not show why the attorney left and Kemper has not attempted an explanation on appeal, so we can only assume he was miffed about the denial of his request. Thereafter the court furnished Kemper's counsel with the jury instructions worked out at the conference in his absence. At that time, with a reporter present, the attorney for Kemper attempted to enter into a discussion about the instructions but was not permitted to do so.

As Kemper does not now assert it had a right to the presence of a reporter and as the record shows an opportunity was furnished to examine and discuss the instructions, there remains only one small matter. In the course of his closing argument, counsel for Kemper referred to one of the proposed instructions.[10] Counsel for plaintiffs objected that the court had agreed to modify the instruction. A hearing was held out of the jury's presence and the modification was made.[11] Kemper now argues it was prejudiced because the jury received the impression that counsel was deliberately misstating the law. To prevent any such prejudice, the court agreed to admonish the jury that Kemper's counsel had not been mistaken. The court also expressed its willingness to add that counsel's intentions were innocent, but Kemper's counsel objected to this language. The admonishment as given stated: "Ladies and Gentlemen, at the recess an objection had been made with reference to a particular instruction discussed by Mr. Burford. Mr. Burford was correct in assuming that the instruction in the form that he cited would

---

[10] Before modification, the instruction read:

"[An owner of property] [A general contractor] in control of premises where work is being done by employees of [the general contractor] [a subcontractor] is an employer subject to the duty imposed by the Labor Code [to provide a safe place of employment] [and] [to comply with the applicable safety provisions thereof].

"Where the [owner] [general contractor] retains only the right of general supervision over the premises to bring about a satisfactory completion of a [general contract] [subcontract], he is not an employer subject to the duties imposed by the Labor Code.

"[A safe place to work means such freedom from danger to the life or safety of employees as the nature of the employment reasonably permits.]"

[11] After modification, the instruction read:

"[A contractor] in control of premises where work is being done by employees of [another contractor] is an employer subject to the duty imposed by the Labor Code [to provide a safe place of employment] [and] [to comply with the applicable safety provisions thereof].

"Where the [contractor] retains only the right of general supervision over the premises to bring about a satisfactory completion of a [contract], he is not an employer subject to the duties imposed by the Labor Code.

"[A safe place to work means such freedom from danger to the life or safety of employees as the nature of the employment reasonably permits.]"

be given by the Court. I have concluded that that instruction should not be given in that form and have modified it, so you can disregard the comments that Mr. Burford made with regard to that instruction." We find this instruction sufficient to cure any possible prejudice.

Judgment is affirmed.

Kerrigan, J., and McDaniel, J., concurred.