[No. A078087. First Dist., Div. Four. Mar. 25, 1998.]

JERRY ZAMUDIO et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Benjamin Sybesma, Carroll, Burdick & McDonough, Ronald Yank and Rosemary Springer for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Martin S. Milas, Assistant Attorney General, Marybelle D. Archibald and Alicia M. B. Fowler, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**REARDON, J.**—Does the Tort Claims Act (Gov. Code,[1] § 810 et seq.) obligate a public entity to defend an employee sued on account of an act or omission in the employee's capacity as a union representative? We conclude it does not when the alleged misconduct relates solely to the individual's union duties and does not implicate his or her employment. In such cases the offending act or omission is not in the scope of the defendant's employment as an employee of the public entity. With this determination we affirm the summary judgment in favor of the government respondents.[2]

## I. BACKGROUND

Appellant Jerry Zamudio served as a youth counselor with CYA at the Fred C. Nelles School for male juvenile offenders since 1979. As well, since 1984 he was president of the Nelles chapter of appellant California Correctional Peace Officers' Association (CCPOA).

In early 1993, CYA notified CCPOA that it intended to start a "Leadership, Esteem, Accountability and Discipline" (LEAD) program at Nelles. The LEAD program, with its boot camp style of approach, was to be a high-profile operation. Because implementation of the program would affect terms and conditions of employment for the CCPOA counselors in the program, CYA was required to notify and meet and confer with CCPOA. (See § 3516.5.) Zamudio participated in negotiations as a member of CCPOA's negotiating team.

The resulting LEAD agreement for Nelles covered such items as uniforms, training, physical conditioning and grooming standards for the assigned youth counselors. It also provided that when the counselors led wards in strenuous activities, they would be given 30 minutes to dress and shower prior to resuming regular activities.

CYA selected 23 men and 3 women as LEAD staff members. In February 1995, the three female counselors and one of their husbands filed a complaint for damages under 42 United States Code section 1983 against Zamudio, CCPOA and various supervisors at Nelles (Aceves v. Vander Weide (Super. Ct. L.A. County, 1995, No. VC018569) (Aceves). The complaint alleged that defendants discriminated against plaintiffs on the basis of

---

[1] All statutory references are to the Government Code unless otherwise specified.

[2] Respondents herein are the State of California (State); California Department of Youth Authority (CYA) and Kathleen Connell, State Controller.

sex by assigning them "deficient and inferior" shower and rest room facilities that were not secure from access by the wards, some of whom, it turned out, spied on them while disrobing, showering, etc., through openings in an unsecured door. In the second cause of action, plaintiffs further accused the superintendent of the Nelles facility and five "Does" of allowing X-rated pornographic videos to be shown to the wards.

As to Zamudio, plaintiffs alleged the following: He was employed by CYA as a correctional peace officer at the Nelles facility, was president of CCPOA and was "responsible and accountable to" and "empowered by the [CCPOA] to implement the policies and terms of the contract" between CYA and CCPOA as it applied to the Nelles facility. Further, Zamudio "had the primary responsibility as president of CCPOA to insure that the provisions of the contract between CCPOA and the State of California regarding sex discrimination in the workplace were properly implemented and enforced." Finally, the complaint said that Zamudio permitted the named Nelles supervisors and teacher to "breach and violate the terms conditions and relevant provisions of the contract."

Zamudio tendered his defense to CYA. CYA rejected the request on the basis that he had been sued in his capacity as a CCPOA officer, not for acts arising out the scope and course of his employment as a youth counselor. CCPOA paid for Zamudio's defense and then Zamudio and the union filed a claim with the State Board of Control pursuant to section 905.2, seeking reimbursement for costs and fees of defense as well as punitive damages. The State Board of Control rejected the claim.

Meanwhile, Zamudio and CCPOA moved for summary judgment in the Aceves action, arguing that Zamudio was a private party for purposes of that lawsuit because he was sued "solely on his alleged duties to, and conduct on behalf of, CCPOA" and "in his capacity as a CCPOA representative . . . ." Then, in February 1996 the Aceves plaintiffs dismissed CCPOA and Zamudio.

That April, Zamudio and CCPOA sued respondents for indemnity and declaratory relief. Both sides moved for summary judgment. The trial court granted summary judgment in respondents' favor, reasoning that Zamudio's liability, as alleged in the Aceves complaint, was based on his failure to carry out his union duties, and those duties were beyond the scope of his employment with the State.

This appeal followed entry of judgment.

## II.  Discussion

### A.  *Standard of Review*

■ On appeal from a summary judgment, we undertake an independent review of the evidence to determine whether any triable issues of material fact were presented. Where there is no dispute over the facts regarding the basis for granting summary judgment, the only dispute is over the legal effect and significance of those undisputed facts. (*Schrader* v. *Scott* (1992) 8 Cal.App.4th 1679, 1683-1684 [11 Cal.Rptr.2d 433].)

### B.  *Analysis*

Upon request, a public entity must defend an action brought against an employee in his or her official or individual capacity, "on account of an act or omission in the scope of his [or her] employment as an employee of the public entity." (§ 995.) There are three permitted grounds for refusal to defend a third party lawsuit: (1) the act or omission of the employee was not within the scope of his or her employment; (2) the employee acted or failed to act because of fraud, corruption or malice; and (3) the defense by the public entity would create a conflict of interest between the entity and the employee. (§ 995.2, subd. (a).)

Where, as in this case, the public entity refuses to defend and the employee retains counsel, the employee is entitled to recover from the public entity reasonable attorney fees and costs if the action "arose out of an act or omission in the scope of his [or her] employment as an employee of the public entity . . . ." (§ 996.4.)

In *Farmers Ins. Group* v. *County of Santa Clara* (1995) 11 Cal.4th 992, 1004 [47 Cal.Rptr.2d 478, 906 P.2d 440] (*Farmers*), our Supreme Court explained that the phrase "scope of employment" has been interpreted broadly in this State under respondeat superior principles. One such principle boils down to this: An employer will be liable for those risks of employee conduct that may be fairly regarded as broadly incidental to or typical of the enterprise undertaken by the employer. (*Id.* at p. 1003.) " 'Accordingly, the employer's liability extends beyond his [or her] actual or possible control of the employee to include *risks inherent in or created by the enterprise.*' " (*Ibid.*, italics added, quoting *Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676].)

Further, where the employee combines personal business with that of the employer or attends to both at substantially the same time, " " "no nice

inquiry will be made" ' " into which business the employee was engaged in at the time of injury unless it is readily apparent that the employee could *not* have been serving the employer, either directly or indirectly. (*Farmers*, *supra*, 11 Cal.4th at p. 1004.) But if the employee deviates substantially from employment duties for personal purposes, or "if the misconduct is not an 'outgrowth' of the employment," the scope of employment test is not met. (*Id.* at p. 1005.) Thus, if the tort is personal in nature, the employee's mere presence at the worksite and attendance to job duties prior to or subsequent to the tort, will not call into play the principles of respondeat superior. (*Ibid.*)

### 1. *Zamudio Was Not Acting Within the Scope of His Employment With CYA*

Appellants first maintain that since Zamudio was performing youth counselor tasks at the time of the wrongful conduct alleged in the Aceves complaint,[3] then without question he was acting within the scope of his employment and the State was duty-bound to defend him under the Tort Claims Act. But the thrust of section 995 is not what, as a factual matter, the employee actually was doing at a given moment, but whether the lawsuit was brought against the employee "*on account of* an act or omission in the scope of his [or her] employment . . . ." (§ 995, italics added.) The three words "on account of" are key. The wrongful conduct alleged *against Zamudio* had nothing to do with his youth counselor functions. Rather, he was charged with failing to fulfill his responsibility as president of the Nelles chapter of CCPOA, by permitting the Nelles supervisors to breach and violate the terms of the contract between CCPOA and the State concerning sex discrimination in the workplace.

For example, in response to interrogatories concerning facts supporting the contention that Zamudio failed to enforce the contract provisions, plaintiffs stated that Kathy Chavez (one of the Aceves plaintiffs) sought his help "as the on site President of CCPOA regarding the shower incident, and the reassignment of the female staff members . . . ." Zamudio apparently said he would speak with the assistant superintendent, but never got back to plaintiffs. The gist of the lawsuit is that Zamudio breached his duty as union

---

[3]Appellants argue that in addition to implicating Zamudio in the shower incident, the Aceves plaintiffs also allege Zamudio shared responsibility for showing X-rated videos to the wards at Nelles. One of CCPOA's interrogatories asked whether plaintiffs contended that Zamudio "was in any way responsible for any pornographic videotapes being shown to prisoners." They responded "Yes." This does not raise a triable issue that Zamudio was sued on account of an act or omission in the scope of his employment. First, he was not named as a defendant in the second cause of action. Second, the use of the phrase "in any way" is so broad that a "yes" answer, without any allegations or discovery showing Zamudio's involvement as an employee with that purported incident, does not implicate his employment.

representative by failing to put on his "union hat" to protect plaintiffs. Had Zamudio not been a union officer, he would not have been sued. The lawsuit had nothing to do with acts or omissions stemming from Zamudio's status as a CYA youth counselor.[4]

### 2. *Zamudio's Union Duties Are Not Within the Scope of His CYA Employment*

Appellants next insist that Zamudio's union activities were within the scope of his employment and in essence CCPOA was part of the fabric of CYA life. They contend that Zamudio's purported failure to perform his duties as union representative was a risk inherent in the CYA enterprise because it was "foreseeable" to CYA within the meaning of *Farmers*. *Farmers* says that "foreseeability" as a test for respondeat superior simply means " 'that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.]' " (*Farmers, supra,* 11 Cal.4th at p. 1004, italics omitted.)

It is important at this juncture to distinguish the present case from the typical "scope of employment" situation. *Farmers* and most of the cases mentioned therein involved incidents of sexual harassment, sexual misconduct or assaults. In other words, abusive *personal* actions toward others. Here we have a situation where an individual wears two hats—that of employee and that of union representative.

Without question correctional officers and other State employees have the right to form employee organizations (§ 3515), and the CCPOA-CYA contract in particular allows CCPOA stewards to conduct certain CCPOA

---

[4]Appellants also make the argument that Zamudio could not have been sued in the Aceves action if he were only a union representative and not also a State employee, because of the "state action" requirement for actions brought under 42 United States Code section 1983. Without delving into the subtleties of the section 1983 standing requirements, this argument leads nowhere. Zamudio may very well have an ironclad defense to the Aceves lawsuit, but that does not mean that the alleged misconduct was within the scope of his employment with the State!

So, too, appellants point out that discovery in Aceves established that neither the Nelles agreement nor the memorandum of understanding between CYA and CCPOA contains any provisions concerning the location of, or security for, women's showers. This, too, is beside the point. Again, Zamudio can defend on grounds that he had no duty as union representative to the female counselors regarding shower facilities, pointing to the operative agreements. But the presence of a viable defense does not transmute plaintiffs' claims against Zamudio into claims against him on account of his peace officer as opposed to union function. It simply means they lose.

business during on-duty time. Correctional officers and other State employees also have the right *to refuse* to join employee organizations. (*Ibid.*) CYA employees thus are not compelled to be represented by CCPOA, and CYA as a state entity has nothing to do with CCPOA's existence. CYA and CCPOA are separate legal entities, have separate functions and CYA extends no control over the existence or operation of CCPOA. Indeed, it is unlawful for the State to interfere with the administration of any employee organization or to support such organization. (§ 3519, subd. (d).) Thus, losses due to the neglect or substandard *performance of CCPOA duties* simply do not foreseeably result from the *conduct of the CYA enterprise* and thus should not be allocated to CYA as a cost of doing business.

Moreover, while we acknowledge the general rule that an employee generally operates within the scope of employment when engaged in pursuits that are of some benefit to the employer or have become a customary incident of the employment relationship (see *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 620 [124 Cal.Rptr. 143]), that same rationale does not apply to pursuits attributable to the employee's *position* with a separate legal enterprise. CCPOA has its own officers and employees, its own income source and budget and its own responsibilities, as does CYA. Like public entities with respect to their employees, unions generally are responsible for the tortious conduct of their officers, agents and employees when such persons are acting within the scope of their employment. (*Maggio, Inc.* v. *United Farm Workers* (1991) 227 Cal.App.3d 847, 858 [278 Cal.Rptr. 250].) Indeed, the CCPOA standard operating procedures manual provides that CCPOA employees, officers and job stewards shall be provided with the cost of legal defense as to "any duty of fair representation claim or malpractice claim" made against them.

Nonetheless, appellants cite a host of out-of-state workers' compensation cases wherein injured union representatives or injured employees participating in union meetings were entitled to workers' compensation benefits, based on what appellants characterize as the theory that union activity is of mutual benefit to employer and employee. Workers' compensation claims of course have to do with injury to the worker, not to a third person. The legal rationale and theory for workers' compensation and Tort Claims Act cases differ as does the burden of proof. The " ' " ' 'scope of employment' " ' " test for determining vicarious liability of public entities defines a more restricted array of employee conduct than does the " ' " ' " 'arising out of and in the course of employment' " ' " ' " test for ascribing workers' compensation benefits. (*Wank* v. *Richman & Garrett* (1985) 165 Cal.App.3d 1103, 1111 [211 Cal.Rptr. 919].) Thus, an employee may have a compensable injury

under workers' compensation but not be within the scope of employment for purposes of vicarious liability. (*Ibid.*) The cases cited by appellants simply are inapposite.

### 3. Policy Considerations Defeat Vicarious Liability Here

Finally, contrary to appellants' assertions, imposing vicarious liability on the State would not further the policy justifications for the respondeat superior doctrine. These justifications are to: (1) prevent recurrence of the misconduct; (2) give the victim greater assurance of compensation; and (3) make sure that the victim's losses are borne equitably by those who benefit from the enterprise giving rise to the injury. (*Farmers*, *supra*, 11 Cal.4th at p. 1013.)

To begin with, there is nothing the State can do to guard against "recurrence" of lax union representation. From a legal as well as a practical point of view, only the union can monitor and hold accountable its employees and officers. Moreover, to hoist that responsibility onto the State in this situation would create a classic double bind. The State, as management in this situation, cannot at the same time both ensure that it is properly and efficiently managing *and* protecting workers if and when management oversteps its bounds or fails to perform as promised. Common experience tells us that because of the conflicting roles, rights and duties of labor and management, the relationship between employer and union can at times be adversarial.[5]

Next, on a more simplistic level, by pulling more parties into the web of vicarious liability, the injured victim will always stand a better chance of realizing any award of compensation. But CCPOA, with its own dues structure, budget and employees, and its own obligation to indemnify officers and employees, is the proper vicarious party in this situation.

Last, the enterprise that gave rise to the alleged injuries is the CCPOA, and those who benefit from that enterprise are its members. It is equitable that CCPOA, funded in part by fees from members, bear the expense of any losses to victims (and associated defense costs) stemming from alleged

---

[5]Indeed, the very notion that a union should be viewed as the agent of the employer or that the employer should somehow be involved in, or responsible for the outcome of, a dispute between union members and their union representative would, undoubtedly, shock the likes of John L. Lewis, George Meany and Walter Reuther, and would represent, from a union perspective, a major step backward in the labor movement.

union misconduct. It is reasonable for those on the front line of union activity to expect such indemnification, and for members benefiting from their efforts to expect to help pay for such indemnification through membership fees.

We affirm the judgment.

Hanlon, P. J., and McGuiness, J., concurred.

Appellants' petition for review by the Supreme Court was denied June 10, 1998.