935 P.2d 274 (1997)
The STATE of Nevada, DEPARTMENT OF HUMAN RESOURCES, DIVISION OF MENTAL HYGIENE AND MENTAL RETARDATION, Appellant,
v.
Julie JIMENEZ, as Guardian Ad Litem for John Doe, a Minor, Respondent.
No. 26021.
Supreme Court of Nevada.
March 27, 1997.
*275 Frankie Sue Del Papa, Attorney General, and Cynthia A. Pyzel, Senior Deputy Attorney General, Carson City, for Appellant.
Durney and Brennan, Reno; Calvin R.X. Dunlap, Reno, for Respondent.

OPINION
PER CURIAM:
The instant appeal arises from allegations of sexual assaults of a minor involuntarily placed in a State agency for adolescent sex offenders. After the program's supervisor, Mike Peters, had been relieved of his duties for reasons unrelated to the allegations in this lawsuit, the minor revealed that he had been repeatedly sexually assaulted by Peters. Julie Jimenez, mother and guardian ad litem of the minor (hereinafter referred to as John Doe), sued the State for negligent supervision of Peters and for the resulting false imprisonment, battery, and sexual assault of her son.
The district court found the State liable for nine counts of sexual assault and one count of *276 negligent supervision and awarded Jimenez the statutory maximum allowed for each count, $50,000. We conclude that the district court properly found liability and assessed damages on the counts for sexual assault. We also conclude that the district court properly found liability on the count for negligent supervision but that the award of damages for that count amounted to a double recovery for a single injury and must be reversed.

FACTS
In 1990, the State of Nevada Department of Human Resources, Division of Mental Hygiene and Mental Retardation (the State), operated the Northern Nevada Child and Adolescent Services (NNCAS). NNCAS ran a variety of programs ranging from residential to outpatient programs and programs for very young children to adolescents. Two of the programs, including the one in which John Doe was enrolled, were based on a nationally recognized behavioral program, the Family Learning Home Model. The State had been running family learning home programs since 1975.
As an agency of the State of Nevada, NNCAS's hiring and employment practices are required to meet the State's laws and regulations. These include reference and fingerprint checks and a probationary evaluation period for new employees. If an employee successfully completes probation, he or she is considered a permanent employee. As employees of a state agency, individuals are also subject to an annual review.
In 1987, Michael Peters was hired as a Mental Health Technician by the Nevada Mental Health Institute (NMHI), an agency also under the control of the State's Division of Mental Hygiene and Mental Retardation. After three months of reviews indicating quality work performance, Peters laterally transferred to a position in the NNCAS with the Adolescent Treatment Center, a twenty-four hour awake supervision facility for the treatment of adolescents with mental disorders. For this position, Peters filled out another employment application, provided references from his supervisor at NMHI, and was fingerprinted so that the FBI could do a background check for any criminal history.
In late 1989, NNCAS was reviving its sexual offender treatment home at Desert Hills and was looking for a professional teaching partner. Until 1989, the Desert Hills program had operated with a teaching couple living at the home. After the last couple left the program, the State could not find replacements and was forced to terminate the program. The State then chose to use "teaching partners" instead of the teaching couple in order to facilitate the hiring of better qualified individuals and to enable continuation of the program if one of the teaching partners were to leave.
In December of 1989, Peters commenced work at the Desert Hills program as the administrator. He received training from nationally recognized experts in the treatment of adolescent sexual offenders and spent time with the former supervisor of the program. At that time, no problems or concerns were identified regarding Peters' ability to perform the job or about his ability to work with adolescents. Peters was initially brought over to the Children Behavioral Services program to learn the Family Learning Home Model upon which Desert Hills was based.
Around April of 1990, two other professional teaching partners, Noel Cullen and Deborah Henson, joined Peters at Desert Hills. Desert Hills reopened in June of 1990 with Peters designated the home supervisor of the program. Peters' co-workers began to have problems with the manner in which Peters was supervising them. The State claims that the complaints did not address how Peters dealt with the children, but only how he treated his co-workers. Henson and Cullen felt Peters was belittling them and was not letting them share equally in the duties and responsibilities.
The complaints culminated in two meetings between Peters and his supervisor, Les Gruner. At the second meeting on July 24, 1990, it became clear to Gruner that Peters had not listened to him and had not implemented any changes in his supervisory methods. That afternoon, Peters was relieved of his duties at Desert Hills and placed on administrative leave. The State contends *277 that up to this point there had been no indication that Peters might be sexually assaulting any of the children. However, evidence was presented at trial that, prior to his removal, Peters had demonstrated inappropriate behavior at Desert Hills, specifically that he had sexually suggestive magazines at the group house and that complaints had been lodged with Gruner regarding this behavior.
John Doe was the third child brought into the program. He was brought in on June 25, 1990, when he was fourteen. He had been diagnosed since birth as learning disabled and mildly retarded. For the preceding four years, John Doe had been subjected to sexual assaults by a maternal uncle and his cousins. Around 1988 or 1989, John Doe began to sexually assault his younger brother. In February of 1990, his mother caught him having anal intercourse with his younger brother. He was put on juvenile probation; however, he continued to sexually assault his brother, and the court ultimately put him in the Desert Hills program for treatment.
On July 28, 1990, approximately one month after John Doe's admission to the program and four days after Peters was relieved of his duties, allegations of Peters' sexual assaults of John Doe were made by John Doe. The staff decided to question John Doe in response to his behavior after Peters had left the program. John Doe stated that Peters would come into his room, talk to him, and then subject him to anal intercourse. John Doe said that to the best of his recollection, the number of times Peters sexually assaulted him was in the "double figures." John Doe testified at trial that he did not report the assaults because Peters threatened him and because Peters' assaults on him made him feel like "trash." He also testified he had looked up to Peters like a father.
Following these allegations, Cullen and Henson notified law enforcement, child protective services, and their supervisors. The State claims this was the first time any allegation of impropriety toward clients was made about Peters. Law enforcement officials interviewed the other children in the program who had been around Peters and uncovered no other allegations of impropriety. However, at trial, a minor client of Children's Behavior Services, the agency Peters had worked for prior to going to Desert Hills, testified that Peters had also sexually assaulted him and subjected him to anal intercourse "over one-hundred times" during a six-month period.
A medical examination of John Doe revealed that he had sustained sexual trauma, but the State claimed that due to John Doe's extensive history of prior abuse, no conclusions could be reached regarding the allegations against Peters. Peters was placed on administrative leave for the duration of the investigation and then laterally transferred back to the NMHI.
Julie Jimenez, John Doe's mother, was appointed as his guardian ad litem. She sued the State for negligent supervision of Peters and for the resulting false imprisonment, battery, and sexual assault of her son. The district court found that Peters scheduled the employee rotations so that he would be the sole staff member on the premises during the nighttime shifts. His duties on the night shift included checking the boys' rooms when they were sleeping. The district court also found that "on nine separate and distinct occasions, when Mike Peters entered [John Doe's] room while performing his assigned employment duties, he sodomized [John Doe] without the consent and against the will of [John Doe]."
The district court concluded by finding the State liable for nine counts of sexual assault and one count of negligent supervision. The court found that John Doe suffered physical and emotional injuries and would continue to suffer such injuries. Accordingly, the district court awarded $50,000 for each of the nine separate acts of sexual assault, along with the additional sum of $50,000 for the State's failure to reasonably supervise the program and its staff, for a total of $500,000 in damages. We conclude that the district court properly awarded damages for the nine counts of sexual assault but that the award of damages for the negligent supervision is tantamount to a double recovery for the same injury and must be reversed.

*278 DISCUSSION

The State waived immunity from liability for Peters' sexual assaults
The State claims that sovereign immunity is not waived for intentional torts and therefore the district court improperly found the State liable for Peters' actions of sexual assault.[1] The State has not challenged the district court's finding of liability on the claim of negligent supervision.
NRS 41.031(1) states:
The State of Nevada hereby waives its immunity from liability and action and hereby consents to have its liability determined in accordance with the same rules of law as are applied to civil actions against natural persons and corporations, except as otherwise provided in NRS 41.032 to 41.038, inclusive, 485.318, subsection 4 and any statute which expressly provides for governmental immunity....
In State v. Silva, 86 Nev. 911, 914, 478 P.2d 591, 593 (1970), this court discussed the statutory codification and the interpretation of sovereign immunity in this state. We stated:
Before the enactment of the statutory waiver of immunity, Nevada case law on the viability of the doctrine of sovereign immunity was uncertain and in flux. The trend was toward the judicial abolition of that doctrine. It is only fair to assume that the 1965 Legislature reacted to that trend, and elected to waive immunity within limits and impose a ceiling upon the recovery allowable to a claimant, rather than await further judicial action upon the subject. The apparent legislative thrust was to waive immunity and, correlatively, to strictly construe limitations upon that waiver.

Id. (citations omitted; emphasis added). Strict construction of NRS Chapter 41 indicates that the Legislature intended to waive the State's sovereign immunity generally and then reinstate that immunity in certain limited circumstances.
NRS 41.0334(2)(a) states that the immunity granted to the State in NRS 41.0334(1)[2] will not apply to any action for injury "intentionally caused" by a State employee. We construe this provision to mean that the State can be held liable for the intentional torts of its employees. However, this liability is subject to the restrictions of NRS 41.03475, which states:
No judgment may be entered against the State of Nevada or any agency of the state or against any political subdivision of the state for any act or omission of any present or former officer, employee, immune contractor, member of a board or commission, or legislator which was outside the course and scope of his public duties or employment.
Based on this language, and employing the Silva standard of strictly construing any limitation on the waiver of immunity, we conclude that the State can be held liable for the intentional torts of its employees provided that those torts are committed within the course and scope of employment.
The rule of law in Nevada permits civil actions to be filed to collect damages for injuries resulting from sexual assaults. Therefore, based on NRS 41.031(1), 41.0334(1), and 41.03475, the State can be held liable for injuries resulting from sexual assaults which occurred during the course and scope of employment. We conclude that the district court did not err in finding that the State waived its immunity for Peters' intentional actions provided that those actions *279 were within the course and scope of Peters' employment.

The State was properly found liable for both the sexual assaults and the negligent supervision

1. Peters acted within the scope of his employment

The State argues that Peters' actions were not within the course and scope of his employment and therefore it is not liable for Peters' actions. The district court, however, found that Peters' duties and the unconditional discretion vested in him by the State gave him unfettered control of and access to John Doe, making the State liable under the doctrine of respondeat superior.
NRS 41.031(1) provides that when the State has waived immunity, the State will have its "liability determined in accordance with the same rules of law as are applied to civil actions against natural persons and corporations." This court has held that in order for an employer to be liable for the intentional tort of an employee, that tort must occur within the scope of the task assigned to that employee. Prell Hotel Corp. v. Antonacci, 86 Nev. 390, 391, 469 P.2d 399, 400 (1970). "[I]f the employee's tort is truly an independent venture of his own and not committed in the course of the very task assigned to him, the employer is not liable." Id. at 391, 469 P.2d at 400.
We take this opportunity to further refine our explanation of "course and scope of employment" from Prell because that explanation gives no substantial guidance as to what is included within the scope of employment. In Prell, we declined to follow the "motivation" test which states generally that there will be no cause of action for respondeat superior if the employee's actions were not primarily motivated by the desire to serve his or her employer. We are mindful of the fact that many jurisdictions follow the "motivation" test. See Andrews v. United States, 732 F.2d 366, 370 (4th Cir.1984) (applying South Carolina law); Hoover v. University of Chicago Hospitals, 51 Ill.App.3d 263, 9 Ill. Dec. 414, 418, 366 N.E.2d 925, 929 (1977); Cosgrove v. Lawrence, 214 N.J.Super. 670, 520 A.2d 844, 846-848 (Law Div.1986). However, we will continue not to require that the employee's actions be motivated by a desire to serve the employer, and in doing so, we join several other jurisdictions. See Doe v. Samaritan Counseling Center, 791 P.2d 344, 346-47 (Alaska 1990) (reversing and remanding a grant of summary judgment in favor of the employer on the issue of vicarious liability for a sexual assault committed on a patient by an employee counselor); Mary M. v. City of Los Angeles, 54 Cal.3d 202, 285 Cal.Rptr. 99, 102, 814 P.2d 1341, 1344 (1991) (reversing and remanding a court of appeals decision reversing a jury verdict imposing liability on the city of Los Angeles for a police officer's rape of a woman in custody); Samuels v. Southern Baptist Hospitals, 594 So.2d 571, 573 (La.Ct.App.1992) (affirming a district court decision finding a hospital vicariously liable for an employee nurse's sexual assault of a patient); Marston v. Minneapolis Clinic of Psychiatry, 329 N.W.2d 306, 309-10 (Minn.1982) (reversing and remanding a lower court decision that the employer was not vicariously liable for a sexual assault committed on a patient by an employee doctor).
We now adopt a new test which maintains Prell's basic tenet of not following the "motivation" test and which employs a "rationale that the employer's liability should extend beyond his actual or possible control over the employees to include risks inherent in or created by the enterprise because [the employer], rather than the innocent injured party, is best able to spread the risk through prices, rates or liability insurance." Rodgers v. Kemper Construction Co., 50 Cal.App.3d 608, 124 Cal.Rptr. 143, 148 (1975). The test we now adopt was first employed by the California Court of Appeals, and states:
One way to determine whether a risk is inherent in, or created by, an enterprise is to ask whether the actual occurrence was a generally foreseeable consequence of the activity. However, "foreseeability" in this context must be distinguished from "foreseeability" as a test for negligence. In the latter sense "foreseeable" means a level of probability which would lead a prudent person to take effective precautions whereas "foreseeability" as a test for respondeat *280 superior merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.

Id., 124 Cal.Rptr. at 148-49 (emphasis added). This test was later used by the California Supreme Court in Mary M. v. City of Los Angeles, 54 Cal.3d 202, 285 Cal.Rptr. 99, 102, 814 P.2d 1341, 1344 (1991), and Perez v. Van Groningen & Sons, Inc., 41 Cal.3d 962, 227 Cal.Rptr. 106, 108, 719 P.2d 676, 678 (1986).
The policy objectives underlying respondeat superior are "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." Mary M., 814 P.2d at 1343. We believe that these three policy objectives underlying respondeat superior would be achieved by applying the doctrine in this case.
First, requiring the State to pay for Peters' sexual assaults would encourage the State to take preventative measures to ensure that such egregious behavior does not occur again. Second, requiring the State to pay would give greater assurance of compensation to the Jimenez family. As was stated earlier, the Legislature has recognized that the imposition of vicarious liability on the State is an appropriate method to ensure that victims are compensated for State actions committed within the course and scope of employment. See NRS 41.03475; Mary M., 285 Cal.Rptr. at 106, 814 P.2d at 1348. Finally, the appropriateness of spreading the risk of loss among the beneficiaries of the enterprise favors imposition of vicarious liability against the State. Because the community derived a substantial benefit from the lawful exercise of Peters' authority, i.e., the sex offenders were separated from society while they were being rehabilitated and the rehabilitated sex offenders would no longer pose a threat to society, the community should bear the cost of Peters' misuse of power. See Mary M., 285 Cal.Rptr. at 107, 814 P.2d at 1349 (stating that the cost resulting from misuse of police power should be borne by the community because of the substantial benefit that the community derived from the lawful exercise of police power).
In cases concerning course and scope of employment, no single factor is necessarily controlling, and each case must be determined on its own particular facts and circumstances. Chapin v. United States, 258 F.2d 465, 467 (9th Cir.1958). "In each case involving scope of employment all of the relevant circumstances must be considered and weighed in relation to one another." Loper v. Morrison, 23 Cal.2d 600, 145 P.2d 1, 3 (1944).
"Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when `the facts are undisputed and no conflicting inferences are possible.' " Mary M., 285 Cal. Rptr. at 105, 814 P.2d at 1347 (quoting Perez, 227 Cal.Rptr. at 109, 719 P.2d at 679). We conclude that in light of the new test adopted today, the factual circumstances of this case did not present a question of law. Therefore, because the judge's conclusion that Peters acted within the scope of his employment was not clearly erroneous, we will not set it aside. Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 592 (1990).
In employing this new test, this court must first determine whether, given the context of Peters' employment, his conduct was so "unusual or startling" that it would seem unfair to include the loss resulting from it in the costs of the employer's business. On this issue, we find the analysis from Mary M. persuasive. Mary M. involved a police officer who raped a woman in custody, and the court in Mary M. stated that because of the great control that police officers have over criminal suspects, "it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct."[3]Mary M., 285 Cal.Rptr. at 108, 814 P.2d at 1350.
*281 In the case at bar, Peters had extensive control over the children he supervised, although it was a different type of control than that which a police officer has over a detainee. As the group home supervisor, Peters had control over almost every aspect of the children's lives. As their counselor, the children looked to him for guidance; John Doe even stated that he looked up to Peters as a father. Furthermore, the children Peters supervised were often the products of troubled backgrounds, vulnerable, and in the case of John Doe, mentally retarded. We therefore conclude that given this type of control, it is extremely unfortunate, but not "startling or unexpected," that Peters, or someone in his position, would misuse his authority by engaging in such behavior.
However, there are exceptions to this new test, and in evaluating such exceptions, this court must consider whether this was a situation where an employee "substantially depart[ed] from his duties for purely personal reasons" such that liability will not attach. John R. v. Oakland Unified School Dist., 48 Cal.3d 438, 256 Cal.Rptr. 766, 771, 769 P.2d 948, 953 (1989). When considering this issue, the proper inquiry is not " `whether the wrongful act itself was authorized but whether it was committed in the course of a series of acts of the agent which were authorized by the principal.' " Perez, 227 Cal.Rptr. at 110, 719 P.2d at 680 (quoting Fields v. Sanders, 29 Cal.2d 834, 180 P.2d 684, 688 (1947)). In Mary M., the court concluded that the police officer was acting within the scope of his employment when he detained the victim, performed a field sobriety test on the victim, and ordered the victim into his car. The court then stated that the officer misused his authority when he sexually assaulted the victim, but viewed as a whole, it could not be said as a matter of law that the officer had substantially departed from his duties for purely personal reasons when he sexually assaulted the victim. Mary M., 285 Cal. Rptr. at 109, 814 P.2d at 1351.
In the case at bar, we conclude that when viewing the incidents as a whole, it cannot be said as a matter of law that Peters had substantially departed from his duties for purely personal reasons when he sexually assaulted John Doe because the sexual assaults were committed during a series of acts authorized by the State. Peters was acting in the scope of his employment when he counseled the children and conducted bedchecks. During the bedchecks and the discussions that sometimes occurred during the bedchecks, Peters misused his authority as a counselor and sexually assaulted John Doe. As such, a conclusion that Peters did not substantially depart from his duties for purely personal reasons is supported by substantial evidence.
We therefore conclude that the judge's determination that Peters' conduct was within the course and scope of Peters' duties was not clearly erroneous and, therefore, that determination will not be overturned.

2. The supervising of the employee was an operational act

Under NRS 41.032, the State can only be held liable for operational and not discretionary acts. NRS 41.032(2) states:
Except as provided in NRS 278.0233 no action may be brought under NRS 41.031 *282 or against an ... employee of the state ... which is:
....
2. Based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the state or any of its agencies or political subdivisions or of any officer, employee or immune contractor of any of these, whether or not the discretion involved is abused.
In Hagblom v. State Dir. of Motor Vehicles, 93 Nev. 599, 604, 571 P.2d 1172, 1176 (1977), this court stated:
When the State qualifiedly waived its immunity from liability and consented to civil actions, it did so to provide relief for persons injured through negligence in performing or failing to perform non-discretionary or operational actions. It did not intend to give rise to a cause of action sounding in tort whenever a state official or employee made a discretionary decision injurious to some persons.
A discretionary act is an act which requires "the exercise of personal deliberation, decision and judgment." Travelers Hotel v. City of Reno, 103 Nev. 343, 345-46, 741 P.2d 1353, 1354 (1987). In a close case between whether an act is discretionary or operational, this court will favor "a waiver of immunity and accommodate the legislative scheme," and only when the court concludes "that discretion alone is involved may [it] find immunity from suit." State v. Silva, 86 Nev. 911, 914, 478 P.2d 591, 593 (1970).
In Silva, this court subjected the State to liability for negligent supervision after a prisoner at an honor camp escaped and sexually assaulted a woman. In subjecting the State to liability, the court stated:
Although the selection of inmates for honor camp service may primarily be a discretionary act, the manner in which the camp is supervised and controlled is mainly operational in nature. Indeed, the very fact that such inmates are not released from prison to roam at will, but remain under state control for work assignment and honor camp living, establishes state recognition that control and supervision is essential.
Id.
As in Silva, we conclude that while the creation of Desert Hills may have been a discretionary function, the State's supervision of Peters was an operational function. Therefore, even if the daily operation of the program and supervision of Peters are not clearly operational functions, it is a very close case between discretionary and operational and warrants our favoring a waiver of immunity. Accordingly, the district court properly found that the supervision of Peters was an operational act and that the State was liable for negligent supervision.

3. The district court did not err in finding the State liable on nine separate counts of sexual assault in addition to one count of negligent supervision

In its findings of fact, the district court stated:
As the entity operating the Desert Hills program, [the State] had the obligation and the opportunity to structure the program and supervise the staff to protect the vulnerable clients from physical, mental, and emotional harm while they were enrolled in the program.
The district court concluded that "[a]s a direct and proximate result of the negligence of the [State] and the sexual molestation and false imprisonment by [Peters], [John Doe] suffered severe physical and emotional injuries, and will continue to suffer consequent injuries in the future." Although the district court acknowledged John Doe could not recover damages exceeding $50,000 for a single action sounding in tort, he could recover for each separate and distinct tort. The district court stated that each act of sodomy, in addition to the one instance of ongoing negligent supervision, constituted a separate and distinct tort, thus allowing ten recoveries of the maximum amount allowed under the statute.
This court has stated that when determining whether a particular situation constitutes a single occurrence or multiple occurrences for the purpose of an insurance *283 contract, it will use the "causal approach" employed by the majority of the jurisdictions. Bish v. Guaranty Nat'l Ins., 109 Nev. 133, 135, 848 P.2d 1057, 1058 (1993). While this case does not involve an insurance contract, the discussion from Bish is instructive to determine whether Peters' actions resulted in one or nine "occurrences" of negligent supervision and sexual assault for which the State is liable. Under the "causal approach," "the inquiry is focused on whether there was one or more than one cause which resulted in all of the injuries or damages." Id.; see also Welter v. Singer, 126 Wis.2d 242, 376 N.W.2d 84, 87 (1985) (stating that the proper inquiry when employing the "causal approach" analysis is whether "a single, uninterrupted cause results in all of the injuries and damage").
This case involves two separate and distinct theories of liabilitynegligent supervision and respondeat superior. The analysis of each theory of liability under the "causal approach" is very different, and we take special care not to combine that analysis. We will apply the "causal approach" analysis to the negligent supervision claims first.
The district court determined that as a direct and proximate result of the State's negligent supervision, John Doe suffered damages. This court recently addressed the issue of whether negligent supervision which results in multiple child sexual assaults constitutes one occurrence or multiple occurrences of negligent supervision. Washoe County v. Transcontinental Ins., 110 Nev. 798, 878 P.2d 306 (1994). In that case, parents of children who were sexually assaulted at a county licensed day care center sued Washoe County for negligently investigating and monitoring the day care center in conjunction with its licensing process. Employing the "causal approach," this court held Washoe County liable for only one count of negligence, stating that Washoe County's liability stemmed from its failure to adequately perform an ongoing duty to investigate and monitor the day care center.
Similarly, in the instant case, the State breached its duty to properly supervise Peters; the only issue is whether the State was liable for nine counts of negligent supervision (one count for each sexual assault) or only one count. We conclude that based on Washoe County, the district judge properly found that the State was liable for only one count of negligent supervision because its liability on that theory stemmed from a single, ongoing causethe continuous failure to supervise Peters. See State Farm Fire & Cas. v. Elizabeth N., 12 Cal.Rptr.2d 327 (Ct. App.1992).
However, just because the State was liable for only one count of negligent supervision does not mean that it was also liable for only one count of sexual assault on the respondeat superior theory. Under a theory of respondeat superior, "the act of the servant within the scope of his employment must be considered the act of the master, for which he is liable to the same extent as though he had performed the act in person." 30 C.J.S. Employer-Employee § 216 (1992); see also Chaney Bldg. Co. v. City of Tucson, 148 Ariz. 571, 716 P.2d 28, 30-31 (1986). Therefore, it is proper to determine which torts Peters would have been liable for had he been sued directly and then impute any of Peters' liability to the State.
Initially, we note that the issue of negligent supervision is irrelevant to the discussion of the State's liability for Peters' intentional torts. See Samuels v. Southern Baptist Hosp., 594 So.2d 571, 574 (La.Ct. App.1992) (stating that "vicarious liability is imposed upon the employer without regard to his own negligence or fault"). Had Peters been sued directly, he would have been liable for nine separate counts of sexual assault regardless of whether he had been negligently supervised or not. Peters could not have successfully employed the "causal approach" to prove that the nine instances of sexual assault stemmed from one proximate cause of negligent supervision, and therefore, that he was liable for only one count of sexual assault.[4]
*284 Furthermore, the situation presented in this case is not similar to that presented in Bish v. Guaranty National Insurance Company, 109 Nev. 133, 848 P.2d 1057 (1993), a negligence case involving a woman who accidently twice ran over a child, first by backing over the child, then after realizing what she had done and panicking, by putting the car in forward gear and driving over the child again. In Bish, this court concluded that there was only one "occurrence" for purposes of liability because the injuries were the result of one proximate, uninterrupted and continuing cause: the driver's negligence. Id. at 136-37, 848 P.2d at 1059. In the case at bar, John Doe was subject to nine separate and distinct sexual assaults over a period of approximately one month, and these assaults cannot be considered to be " `so closely linked in time and space as to be considered by the average person as one event.' " Id. at 139, 848 P.2d at 1058 (quoting Welter v. Singer, 126 Wis.2d 242, 376 N.W.2d 84, 87 (1985)). Therefore, Peters was liable for nine counts of sexual assault, and pursuant to the rules of respondeat superior, the State was also liable for nine counts of sexual assault.

The respondent presented sufficient evidence of damages, but the award of damages for negligent supervision must be reversed because it is tantamount to an improper double recovery
The State argues that Jimenez failed to prove the fact of damages and the amount thereof, and as a result, the damages granted to Jimenez were necessarily excessive. In assessing allegedly excessive damage awards, this court will not substitute its judgment on the issue of damages for the decision of the fact finder. Automatic Merchandisers, Inc. v. Ward, 98 Nev. 282, 284-85, 646 P.2d 553, 555 (1982). This court will only reverse a verdict when the award is flagrantly improper, indicating passion, prejudice, or corruption. Id. at 285, 646 P.2d at 555.
In cases where the damages are for extreme emotional distress, such distress must be manifested by physical injury or illness, something more than just embarrassment. In Branda v. Sanford, 97 Nev. 643, 648, 637 P.2d 1223, 1227 (1981), this court intimated that severe emotional distress could be manifested through such symptoms as hysteria and nervousness, nightmares, great nervousness, and bodily illness and injury.
Initially, evidence of physical injury was presented at trial in the form of medical testimony which proved that John Doe had suffered sexual trauma as a result of being subjected to anal intercourse. Furthermore, John Doe testified that Peters' assaults made him feel "like trash." John Doe also stated: "Sometimes I couldn't even go to sleep at night because I was afraid he would come to my room or do something." Wilford W. Beck, the former agency director for NNCAS, testified that with each rape, John Doe could become more and more ashamed of himself, and that it was his impression that when John Doe testified, he seemed ashamed. Beck also stated: "[I] will say that [sexual assault is] a terrible thing that happens. Whether it ... makes [improvement] less possible, I don't know."
This medical evidence and the testimony of emotional distress, along with the multiple criminal acts committed upon John Doe, support a $50,000 award to John Doe for each of the nine acts of sexual assault. However, despite the fact that the district court properly concluded that the State was liable for one count of negligent supervision, we believe that it was improper to award damages to John Doe on that count. John Doe was properly compensated for the nine acts of sexual assault, and the damages proven by John Doe were all caused by these sexual assaults. To permit further recovery on the basis of negligent supervision is tantamount to awarding the victim an improper double recovery for a single injury. See General Electric Co. v. Bush, 88 Nev. 360, 367-68, 498 P.2d 366, 371 (1972) (explaining that an award of damages for a wife's claim for loss of consortium after her husband had been injured and compensated was not an improper double recovery for the same injury to the husband), abrogated on other grounds by Motenko v. MGM Dist., Inc., 112 Nev. 1038, 921 P.2d 933 (1996). Therefore, while the State was liable on the theory of negligent *285 supervision, we conclude that the district court erroneously awarded damages on that claim when John Doe was fully compensated on the theory of respondeat superior.

The State is not entitled to a setoff for the cost of treatment respondent's son received
The State claims it is entitled to a $130,000 setoff because John Doe was a ward of the court at Colorado Boy's Ranch from September 10, 1992, through March 30, 1994. The State claims that it is entitled to this setoff under NRS 42.020,[5] which states:
1. In any action for damages for personal injury against any provider of health care, the amount of damages, if any, awarded in the action must be reduced by the amount of any prior payment made by or on behalf of the provider of health care to the injured person or to the claimant to meet reasonable expenses of medical care, other essential goods or services or reasonable living expenses.
2. As used in this section, "provider of health care" means a physician ... [or] licensed psychologist....
This statute has not been interpreted by this court. However, we need not reach the issue of its construction because the State failed to pursue a ruling on the issue of the setoff in the district court, thus waiving the issue on appeal. In Cerminara v. District Court, 104 Nev. 663, 765 P.2d 182 (1988), the district court failed to rule on a motion for a new trial after granting a judgment notwithstanding the jury's verdict. The defendant failed to object to this and failed to take any action to compel a ruling on that motion until after this court had rendered a decision on appeal. Id. at 665, 765 P.2d at 184. This court concluded the defendant had abandoned its motion for a new trial. Id.; see also Old Aztec Mine, Inc. v. Brown, 97 Nev. 49, 52-53, 623 P.2d 981, 983-84 (1981) (refusing to consider issues not precisely raised below).
We conclude that the State is not entitled to a setoff in this case because it failed to pursue a ruling on this issue from the district court.

CONCLUSION
The district court properly found that the State had waived its immunity for Peters' actions and concluded that the State was liable for Peters' sexual assaults because Peters was acting within the course and scope of his employment when he sexually assaulted John Doe. Furthermore, we conclude that the district court properly found the State liable on all nine counts of sexual assault and awarded the maximum statutory amount of damages allowed on each count for a total of $450,000. Additionally, we conclude that while the district court also properly found that the State was liable for the one count of negligent supervision of Peters because such supervision was an operational rather than a discretionary act, the award of damages to John Doe on that count amounted to a windfall or double recovery and must be reversed. Finally, the State is not entitled to a setoff for the amount spent on John Doe while at the Colorado Boy's Camp. Accordingly, we reverse the district court's award of damages on the count of negligent supervision and affirm the remainder of the district court's decisions.[6]
NOTES
[1] We find this argument puzzling because in its opening brief to this court, the State conceded that it had waived its immunity for the tortious acts of its employees who acted within the course and scope of employment. Despite this concession, we will still reach this issue.
[2] NRS 41.0334(1) states:

Except as otherwise provided in subsection 2, no action may be brought under NRS 41.031 or against an officer or employee of the state or any of its agencies or political subdivisions for injury, wrongful death or other damage sustained in or on a public building or public vehicle by a person who was engaged in any criminal act proscribed in NRS 202.810, 205.005 to 205.080, inclusive, 205.220, 205.225, 205.235, 205.240, 205.245, 205.271 to 205.2741, inclusive, 206.310, 206.330, 207.210, 331.200 or 393.410, at the time the injury, wrongful death or damage was caused.
[3] The Mary M. court was careful to note that its decision flowed from the unique authority vested in police officers and that employees who do not have such authority and who commit sexual assaults may be acting outside of the scope of employment as a matter of law. Mary M. v. City of Los Angeles, 54 Cal.3d 202, 285 Cal.Rptr. 99, 108 n. 11, 814 P.2d 1341, 1350 n. 11 (Cal.1991).

An example of conduct that a court found "startling and unusual" was presented in Alma W. v. Oakland Unified School District, 123 Cal. App.3d 133, 176 Cal.Rptr. 287 (1981). In Alma W., a janitor at an elementary school sexually assaulted a young female student. The student's mother filed a lawsuit against the school district on a theory of respondeat superior, and the complaint was dismissed by the trial court. In affirming the trial court's action, the Court of Appeal stated that the plaintiff's case stretched the Rodgers "foreseeability" standard far beyond its logical limits. Id., 176 Cal.Rptr. at 291. The court stated:
Thus, while it might be foreseeable for a school custodian to become involved in a dispute over the manner in which he swept the floors or cleaned a classroom and for the dispute to end in someone being hit with a mop, the same statement cannot be made with reference to rape. There is no aspect of a janitor's duties that would make sexual assault anything other than highly unusual and very startling.
Id. at 291-92.
[4] In any criminal action on these same charges, Peters could have been charged with nine separate counts of sexual assault.
[5] This statute was amended in 1995 and now contains different provisions.
[6] The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.